**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )　　　　Case No. 05 CR 727 |
| | ) |
| CONRAD M. BLACK, JOHN A. | ) |
| BOULTBEE, PETER Y. ATKINSON, | ) |
| and MARK S. KIPNIS, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Currently before the Court is the Chicago Tribune's (the "Tribune") Motion to Intervene and for Immediate Public Access to Names of Jurors (the "Motion"). (R. 523-1, Tribune Motion.) The Tribune contends that the Court must disclose the names of empaneled jurors and alternates pursuant to the First Amendment right to access judicial proceedings. (*Id.* at 1.)[1] All Defendants oppose the Tribune's motion, and the government takes no position. For the reasons below, the Court grants the Motion in part, and denies it in part. The Court grants the Tribune's request to intervene, but denies its request to release the names of the jurors during the pendency of the trial.

---

[1] Even though the Tribune asserts that it seeks the "jury list" as well as "the name of the jurors,"(R. 523-1, Tribune Motion at 1, 6), there appears to be no analytical distinction between the two for purposes of the Court's First Amendment analysis. *See, e.g., In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1337 (D.C. Cir. 1985) ("The more precise inquiry, however, is a functional rather than classificational one: whether information *of the sort at issue here* – regardless of its prior or current classification as court records – was traditionally open to public scrutiny." (emphasis original)).

# BACKGROUND

Dubbed by a major Canadian business magazine as the "trial of the century" and by *Vanity Fair* magazine as the "trial of the decade," this case has generated intense international media interest. Over 400 media personnel representing close to 60 organizations have sought and received media accreditation in anticipation of this trial. Organizations such as the British Broadcasting Corporation, Agence France Presse, CTV, Inc. (Canadian Television), The Times of London are accredited and have come from around the globe to cover these proceedings. To accommodate media coverage, the Court has reserved approximately half of its courtroom seating for members of the media and also has arranged a live audio and video feed in two overflow courtrooms. Throughout the initial stages of trial, the live courtroom, as well as both overflows, have been near full capacity.

The global news coverage in the case has been extensive. In recent days (and well before) articles discussing the events in this case have appeared in significant publications and media outlets in Canada, the United States, the United Kingdom, Australia, and elsewhere. *See, .e.g.,* "Conrad Black Deal Is Described," LOS ANGELES TIMES (Apr. 3, 2007); Andrew Stern, "Clever But Not Illegal Ways Used," COURIER MAIL (AUSTRALIA) (Apr. 4, 2007); "Media Glee as Press Baron Goes on Trial," THE LONDON TELEGRAPH (Mar. 25, 2007); Deborah Dundas, "Conrad Keeps Us Under His Spell," BELFAST TELEGRAPH (Apr. 2, 2007); "Black Trial Hears of 'Clever' Payments," CHINA DAILY (Apr. 4, 2007). Events that normally pass without so much as a whisper have, in this case, garnered headlines from the world's leading newspapers and magazines. *See, e.g.,* Rick Westhead, "Pulling Out All the Smirks at Black Trial; Lawyers Woo Jury with Well-Honed Body Language," TORONTO STAR (Apr. 4, 2007); Vanessa Friedman, "Of Hermes and the Courtroom," FINANCIAL

TIMES LTD. (Mar. 30, 2007); James Bone, "Black Gets Back on the Party Circuit," THE TIMES (UK), (Mar. 30, 2007); Janet Whitman, "Blacks Find Free Time for Party Circuit," NEW YORK POST (Mar. 30, 2007). The jurors in this case have not been excepted from the media's discerning eye. Indeed, columnists and commentators have described the jurors' daily in-court activities – *see, e.g.,* Paul Waldie, "Jurors Scribble as Lawyers Expound," THE GLOBE AND MAIL (Wed. Mar. 21, 2007); Romina Maurino, "Jury Starting To Get Bored?" THE WINNIPEG FREE PRESS (Apr. 2, 2007) – as well as their personal descriptions. *See* Christie Blatchford, "Two Viewpoints, Two Approaches, but Ultimately Only One Winner," THE GLOBE AND MAIL (Mar. 21, 2007); *see also* Peter Worthington, "Jury of 'Peers' Selected? What Chance Do These 12 Have of Understanding Fraud Case?" EDMONTON SUN (Mar. 16, 2007); Ian Brown, "A Revealing Glimpse of the Jury that Wasn't," THE GLOBE AND MAIL (Mar. 16, 2007).[2] The case has generated similarly intense commentary in the blogosphere. (*See, e.g.,* R. 560-1, Def. Black's Suppl. Resp. at ¶3, Ex. 5 (citing and attaching excerpts from the following blogs: conradblacktrial.com, thecrimesheet.com, and slate.com).)

Due in part to this global media interest, the Court, after completing voir dire in an open hearing,[3] accepted the parties' peremptory strikes at sidebar. On Tuesday, March 20, 2007, the Court empaneled twelve jurors and six alternates. The Court has disclosed the names and addresses of the twelve jurors and six alternates to the parties, but has not made that information publicly

---

[2]    In order to illustrate the global scope of press coverage in this case, the Court ran quick searches in Westlaw's ALLNEWS database and Google, which revealed the cited articles and numerous others.

[3]    During the voir dire proceeding, each prospective juror identified himself or herself by name in open court.

available.

## ANALYSIS

**I.      The Tribune Has a Right To Intervene**

Because the right of access to judicial records and proceedings "must be balanced against competing values," "representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion from the proceedings or access to documents." *In re Associated Press*, 162 F.3d 503, 508 (7th Cir. 1998) (internal quotation omitted). "Thus, the Press [should be] permitted to intervene in order to present arguments against limitations on the constitutional or common law right of access." *Id.* Accordingly, the Court grants the Tribune's motion to intervene.

**II.     The First Amendment Does Not Grant a Right of Access to Juror Names During the Pendency of Trial**

Although the "right of access to criminal trials is not explicitly mentioned in terms in the First Amendment," it is now "firmly established" "that the press and general public have a constitutional right of access to criminal trials." *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 603-04, 102 S. Ct. 2613, 2618 (1982) ("Underlying the First Amendment right of access to criminal trials is the common understanding that a major purpose of that Amendment was to protect the free discussion of governmental affairs. Thus to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected discussion of governmental affairs is an informed one." (internal quotation omitted)). But not all aspects of a criminal trial are entitled to protection under the First Amendment. While courts have held that the First Amendment right of access applies to criminal trials, to certain preliminary hearings, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10, 106 S. Ct. 2735, 2741, 92 L. Ed.

-4-

2d 1 (1986) ("*Press-Enterprise II*"), to voir dire proceedings, *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508-09, 104 S. Ct. 819, 823, 78 L. Ed. 2d 629 (1984) ("*Press-Enterprise I*"), and to evidence admitted at trial, *United States v. Ladd*, 218 F.3d 701, 704-05 (7th Cir. 2000), courts also have held that the First Amendment does not guarantee access to withdrawn plea agreements, affidavits supporting search warrants, or presentence reports. *In re Boston Herald, Inc*., 321 F.3d 174, 183 (1st Cir. 2003) (citing cases); *United States v. Corbitt*, 879 F.2d 224, 228-29 (7th Cir. 1989) (holding no First Amendment right to access presentence reports). Even when a First Amendment right of access exists it is not absolute, but rather "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45, 104 S. Ct. 2210, 2215, 81 L. Ed. 2d 31 (1984). Indeed, "[n]o right ranks higher than the right of the accused to a fair trial." *Press-Enterprise I*, 464 U.S. at 508, 104 S. Ct. at 823; *see also Neder v. United States*, 527 U.S. 1, 30, 119 S. Ct. 1827, 1844, 144 L. Ed. 2d 35 (1999) ("When the Court deals with the content of th[e] guarantee [to a trial by impartial jury] – the only one to appear in both the body of the Constitution and the Bill of Rights – it is operating upon the spinal column of American democracy.") (Scalia, J. *in dissent*).

A.      **The Test for the Right of Access**

To determine whether the First Amendment provides a qualified right of access to a particular aspect of a criminal proceeding, a court must consider (1) whether "the place and process have historically been open to the press and general public" (the "experience test"), and (2) that "public access plays a significant positive role in the functioning of the particular process in question" (the "logic test"). *Press-Enterprise II*, 478 U.S. at 8, 106 S. Ct. at 2740 (further noting

that the court looks to history when determining whether the right to access exists "because, a tradition of accessibility implies the favorable judgment of experiences"); *see also Gannett Co. v. State*, 571 A.2d 735, 749 (Del. 1989) ("[w]hen applied to the historical experience, therefore, the logic test helps 'to distinguish between what the Constitution permits and what it requires'" (quoting *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 385, 99 S. Ct. 2898, 2908, 61 L. Ed. 2d 608 (1979))); *Corbitt*, 879 F.2d at 228 (describing *Press-Enterprise II* as enunciating a two-prong analysis consisting of "experience test" the "logic test"). The party alleging the existence of the qualified First Amendment right bears the burden of establishing both parts of this threshold test. *Gannett*, 571 A.2d at 749; *Matter of 2 Sealed Search Warrants*, 710 A.2d 202, 207 (Del. Super. Ct. 1997) ("The party seeking a First Amendment right of access must make a two-part threshold showing known as the experience and logic tests . . . If the court finds that the moving party has made this showing, a qualified First Amendment right of access attaches." (citing *Press-Enterprise II*, 478 U.S. at 8, 106 S. Ct. at 2740)); *Corbitt*, 879 F.2d at 228 (finding no right to access under the First Amendment: "[w]e believe that Pulitzer's [the newspaper publisher intervenor] assertion of a right to inspect Corbitt's presentence report fails to satisfy either prong of this 'experience and logic' test").[4] Only then does the burden shift to the party seeking disclosure to establish that (1)

---

[4]     Similarly, under the common law right to access analysis – an analysis distinct from the constitutional analysis, *see Corbitt*, 879 F.2d at 238 – the initial burden rests with the party seeking access. *See id.* ("We cannot agree with the district court's analysis, which essentially places the burden on the government to make a particularized showing that disclosure is unwarranted, preceded only by the most generalized showing of "need" by the news organization seeking access to the report. Instead, we believe that the news organization seeking access to a presentence report must make a substantial, and specific, showing of need for disclosure before a district court may allow public inspection of the report."). Although the Tribune mentions once – in one sentence without citation to any legal authority (R. 523-1, Tribune Motion at 1, ¶1) – that it seeks disclosure under the common law right to access, it has failed to develop, and thus has waived, this argument. *See United States v. Berkowitz*, 927 F.2d

"there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent" and (2) "reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Press-Enterprise II*, 478 U.S. at 14-15, 106 S. Ct. at 2743; *see also Press-Enterprise I*, 464 U.S. at 510, 104 S. Ct. at 824 (party seeking closure must establish that "closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.").

### 1.    The Experience Test

Unquestionably, the First Amendment guarantees the press and public the right to attend the voir dire *proceeding*. *Press-Enterprise I*, 464 U.S. at 508, 104 S. Ct. at 823. Consistent with the holding of *Press-Enterprise I*, both the press and public had access to the voir dire proceedings in this case. But the question before the Court is the distinct issue of whether the Tribune has a constitutional right to learn the jurors' names before the jury returns its verdict, or whether the Court maintains discretion in this regard. *See also Gannett*, 571 A.2d at 740-41 (considering itself the first court to "confront the novel issue whether the news media have a qualified first amendment right of access requiring announcement of jurors' names during a criminal trial" – "Other cases regarding the media's right of access to jurors' names presented questions of prior restraints on the press, the public's right of access to judicial records, and the actual closure of courtroom proceedings.").

---

1376, 1384 (7th Cir. 1991) ("We have repeatedly made clear that perfunctory and undeveloped arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." (parentheses original)); *Head Start Family Educ. Program, Inc. v. Cooperative Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995) (the "argument is raised in a short conclusory paragraph which contains no substantive argument, legal citations, or references to the record. This court has no duty to research and construct legal arguments available to a party.").

Several reasons suggest that the release of juror names is a matter of discretion vested in the Court rather than a constitutional right.

Foremost, the Tribune has failed to provide any case law to support its assertion that such a constitutional right exists. The Tribune spends the bulk of its twelve-paragraph Motion addressing authority that deals with "anonymous juries" or closing voir dire proceedings – situations distinct from the disclosure of juror names that the Tribune seeks here. (R. 523-1, Tribune's Motion at ¶¶1, 3, 4, (referring to the empaneled jury in this case as an "anonymous jury"), 7-11 (arguing that "[t]here is no justification for an anonymous jury in this case"), 2, 6, 10 (citing cases addressing the propriety of closing voir dire proceedings); *see also* R. 539-1, Tribune Reply at 2, 4 (citing cases discussing the closure of voir dire), 4-6 (arguing that an "anonymous jury" is not warranted in this case).)[5] First, contrary to the Tribune's assertion, the Court has not empaneled an anonymous jury. Empaneling an "anonymous jury," as the case law makes clear, means that the court does not disclose juror names *to the parties. See, e.g., Mansoori*, 304 F.3d at 649 ("the district court decided not to disclose the names or the home and work addresses of prospective and empaneled jurors to the parties, the public, or the media – a step that resulted in an anonymous jury"); *United States v. Shryock*, 342 F.3d 948, 970 (9th Cir. 2003) (court empaneled an anonymous jury "by ordering that the names, addresses, and places of employment of prospective jurors and their spouses not be disclosed to counsel, either before or after selection of the jury panel"). The parties here know the identities of the twelve jurors and six alternates as well as all the other identifying information

---

[5]        Specifically, the Tribune in its Motion cited *United States v. Mansoori*, 304 F.3d 635, 650 (7th Cir. 2002) regarding "anonymous juries," and cited the following cases regarding the public's right to attend voir dire proceedings: *Press-Enterprise I*, 464 U.S. 501, 104 S. Ct. 819; *ABC, Inc. v. Stewart*, 360 F.3d 90 (2d Cir. 2004); *United States v. Peters*, 754 F.2d 753 (1985); *United States v. Warner*, 396 F. Supp. 2d 924 (N.D. Ill. 2005).

provided to the Court.  Second, as previously noted, the voir dire proceedings were open to members of the media and public.

The only case the Tribune's Motion cites regarding the release of juror names before the return of a verdict is *In re Baltimore Sun Co.*, 841 F.2d 74 (4th Cir. 1988).[6]  Although that case ordered the release of juror names, it expressly declined to reach the constitutional issue that is currently before the Court:  "[w]e see no need to and do not base our decision on the First Amendment."  *Id.* at 75 n.4 (applying "what has always been the law to require a district court, upon the seating of the panel of a jury and alternates. . . to release the names and addresses of those jurors who are sitting," but failing to cite authority for that proposition); *see also Gannett*, 571 A.2d at 742 ("To our knowledge, however, no court has yet recognized a right of access to jurors' names.").  In any event, a number of other cases opine that the courts' prevailing practice traditionally has been to the contrary:

- "During the jury selection process, the names of the persons selected and other jurors being examined were called in open court.  The district court imposed no restriction on publication of the names called in open court.  *But the judge was following a well-established practice when he refused to publicly release the jury list, which included the names, addresses, and other personal information about the jurors*.  Such protection of the privacy of the jurors was clearly permissible, and certainly appropriate in a trial which attracted public attention as this one did."  *United States v. Gurney*, 558 F.2d 1202, 1210 n.12 (5th Cir. 1977) (emphasis added);

- "*The right of the Court to protect the anonymity of the jury through trial, deliberations, and verdict appears undoubted* and neither newspaper seeks to challenge it here. . . . Before turning from the historical analysis, however, it is appropriate to note that immediate unrestricted post verdict access to jurors is contrary to the general norm and historical practice of American courts and this Court takes judicial notice of that fact."  *United States v. Doherty*, 675 F. Supp. 719, 722 n.4 (D. Mass. 1987) (emphasis added);

---

[6]     The Tribune also cites *In re Globe Newspaper Co.*, 920 F.2d 88, 90 (1st Cir. 1990), which considers the disclosure of juror names *after a jury renders a verdict*.

- "It has been the operating procedure and long-standing policy of this Court not to disclose to persons, other than the parties to a particular litigation, the names and addresses of a jury panel until after that panel has completed its term of service." *In re Indianapolis Newspapers, Inc.*, 837 F. Supp. 956, 957 (S.D. Ind. 1992).

*See also United States v. Brown*, 250 F.3d 907, 914-15 (5th Cir. 2001) (reaffirming *Gurney*, a pre-*Press-Enterprise* case, and citing *Gurney* for the proposition that "a trial court may refuse to allow the media to inspect documents not a matter of public record, including jurors' names and addresses; such orders are distinct from prior restraints").[7]

Additional authority further suggests that juror names are not presumptively public during the pendency of trial. A number of cases, for example, address the press' request to release juror names *after the return of the verdict* – cases that silently reflect a practice of not releasing names and information during the pendency of trial. *See In re Globe Newspaper*, 920 F.2d at 90 (considering a newspaper's post-verdict request to have access to juror names and addresses); *Doherty*, 675 F. Supp. at 720 (same); *In re Disclosure of Juror Names and Addresses*, 592 N.W.2d 798, 799 (Mich. Ct. App. 1999) (same). In addition, 28 U.S.C. §1863 – a statute that requires district courts to develop a master plan for random jury selection – specifically states that a court may adopt a plan that does not reveal prospective juror names at all. 28 U.S.C. §1863(b)(7)[8] (a court's plan for

---

[7] Although these cases suggest that access to juror names has not been historically available to the press and public, the Court does not definitively reach that issue because the Tribune's motion wholly fails to analyze this aspect of the *Press-Enterprise* test.

[8] Pursuant to this statute, the United States District Court for the Northern District of Illinois has adopted a master plan that provides the following:

No person shall make public or disclose to any person, unless so ordered by a judge of this Court, the names drawn from the Qualified Jury Wheel to serve in this Court until the first day of the jurors' term of service. Any judge of this Court may order that the names of jurors involved in a trial presided over by that judge remain confidential if the interests of justice so require.

-10-

selecting random jurors shall "fix the time when the names drawn from the qualified jury wheel shall be disclosed to parties and to the public. *If the plan permits these names to be made public*, it may nevertheless permit the chief judge of the district court, or such other district court judge as the plan may provide, to keep these names confidential in any case where the interests of justice so require." (emphasis added)); *In re Globe Newspaper*, 920 F.2d at 92 ("The second sentence in § 1863(b)(7) is, to be sure, prefaced with the words, 'If the plan permits these names to be made public . . .,' suggesting that a local plan might optionally decline to permit juror names to be made public at all. This option was apparently inserted to allow the present diversity of practice around the nation to continue. Some district courts keep juror names confidential for fear of jury tampering. Other district courts routinely publicize the names." (citing H.R.Rep. No. 1076, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Admin.News 1792, 1801) (internal quotation and certain internal punctuation omitted)). In light of the above-cited authority, the Tribune has failed to establish that "experience" establishes a constitutional right to access juror names during the pendency of trial.

### 2. The Logic Test

The Tribune also fails to establish that public access would "play[] a significant positive role in the functioning of the particular process in question." *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198, 217 (3[d] Cir. 2002) ("for to gauge accurately whether a role is positive, the calculus must perforce take account of the flip side – the extent to which openness impairs the public good"). The jury occupies a critical, but shrouded role in the criminal process. *See, e.g., Doherty*,

---

(R. 539-1, Tribune Reply, Ex. A at ¶10a.) For the reasons stated at length in this Opinion, the Court has determined that the interests of justice require that the empaneled jurors' names remain confidential.

675 F. Supp. at 722 ("It is beyond peradventure that the actual deliberations of a jury are private and confidential and not subject to public access." (citing, among other authority, O. Holmes, The Common Law 122-19 (1881); 3 Blackstone's Commentaries 349 (1768))).  Every jury deliberates in private and moreover, to ensure that a jury's inner workings remain secret, the law imposes affirmative barriers to restrict outside efforts from prying into a jury's deliberations.  *See, e.g.,* 18 U.S.C. § 1508 (making it illegal to knowingly record, listen to, or observe any grand or petit juries while they deliberate or vote); Fed. R. Evid. 606(b) (jurors "may not testify as to any matter or statement occurring during the course of the jury's deliberations . . . ").  The only external output of the jury's function is the end product – the verdict.  *See United States v. Cunningham*, 108 F.3d 120, 121 (7th Cir. 1997) ("When a jury returns a verdict, it does not supply its reasons.  The jury deliberates, in private . . . [and] [e]ventually, the jury delivers a one-or two-word verdict: 'guilty' or 'not guilty.'"); *In re Globe Newspaper*, 920 F.2d at 94 ("Clearly, there is no ordinary public right to 'know' what occurs in the jury room.  It is undisputed that the secrecy of jury deliberations fosters free, open and candid debate in reaching a decision.").  The lack of public scrutiny into the jury's function contrasts significantly with other aspects of criminal proceedings that fall within the First Amendment right to access, such as pretrial hearings, voir dire, and the trial itself.

This contrast is significant.[9]  As the Supreme Court has explained, public access to voir dire ensures fairness because:

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being

---

[9]    The factual distinction between access to voir dire proceedings, on the one hand, and access to juror names, on the other, is why *Press-Enterprise I* and *Peters*, 754 F.2d 753, do not control the analysis or outcome here.

> followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system. . . . Proceedings held in secret would deny this outlet and frustrate the broad public interest; by contrast, public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected.

*Press-Enterprise I*, 464 U.S. at 508, 104 S. Ct. at 823 (1984); *In re Globe Newspaper*, 920 F.2d at 94 ("The Supreme Court has identified the following purposes which open justice serves: assuring that proceedings are conducted fairly; discouraging perjury, misconduct of participants, and biased decisions; prophylaxis as an outlet for community hostility and emotion; ensuring public confidence in a trial's results through the appearance of fairness; inspiring confidence in judicial proceedings through education regarding the methods of government and judicial remedies.") (citing *Richmond Newspapers*, 448 U.S. at 569, 100 S. Ct. at 2823)). An open proceeding helps ensure fairness in part because openness allows the press and public to absorb the nonverbal aspect of the proceedings[10] – an aspect not revealed by the transcript alone:

> [D]ocumentary access is not a substitute for concurrent access, and vice versa. . . . [W]here a right of access exists, a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available. Such a transcript would not fully implement the right of access because some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript.

*United States v. Antar*, 38 F.3d 1348, 1360 n.13 (3rd Cir. 1994); *Stewart*, 360 F.3d at 99 ("But one cannot transcribe an anguished look or a nervous tic. The ability to see and to hear a proceeding as

---

[10] The press and public can observe the non-verbal aspects of the jury as they absorb the evidence in the case. Indeed, media has commented on the attentiveness of the jury in this case. (*See, e.g.*, R. 560-1, Def. Black's Suppl. Resp., Ex. 1 (attaching Mary Wisniewski, "Witness' Math Skills Questioned," CHICAGO SUN-TIMES (Apr. 6, 2007), an article commenting that "Thursday's testimony was frequently tedious . . . [t]he jurors, however, appeared alert and took notes.").

is unfolds is a vital component of the First Amendment right of access – not, as the government describes, an incremental benefit."); *see also United States v. Huebner*, 356 F.3d 807, 812-13 (7th Cir. 2004) (the factfinder "has the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record" (quoting *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir. 1993))); *Soc'y of Prof'l Journalists v. United States Sec'y of Labor*, 616 F. Supp. 569, 578 (D. Utah 1985) ("[T]he full flavor of [a] hearing cannot be sensed from the sterile sheets of a transcript. Emotions, gestures, facial expressions, and pregnant pauses do not appear on the reported transcript. Much of what makes good news is lost in the difference between a one-dimensional transcript and an opportunity to see and hear testimony as it unfolds." (citation omitted)). Put differently, there is a logical link between public access to voir dire (to fully appreciate all verbal and nonverbal communication) and the benefit of access (to ensure that the government deals fairly with a defendant).[11]

But open access to juror names during the pendency of trial has no similar effect and, in fact, disclosure *enhances the risk* that the jury will be not be able to function as it should, in secrecy and

---

[11]     Limiting access, however, may be appropriate when necessary to preserve higher interests. *See, e.g., United States v. Marzook*, 412 F. Supp. 2d 913 (N.D. Ill. 2006) (closure appropriate to protect the release of classified information); *see also Stewart*, 360 F.3d at 100 ("We do not mean to suggest that providing documentary, in lieu of concurrent, access is never an appropriate result. Where, applying the constitutionally mandated balancing test, a court has found that concurrent access must be denied, the provision of a transcript may well be the best available substitute.").

free of any outside influence.[12]  *See Doherty*, 675 F. Supp. at 725 n.7 ("The Globe [newspaper],

however, advances the absolutist view that it has a right to immediate access in order to satisfy the

public's interest at a time when it is focused on the most dramatic stage of a jury trial – the return

of the verdict.  With respect, this is little more than an argument that it wants the information to sell

more papers.  While this is hardly an ignoble end, it flies in the face of the historic traditions of the

courts, does nothing to enhance the jury system (in fact, it may harm it through undue inquiry into

the jury's deliberations), and exposes the jurors to press intrusion when they are most emotionally

drained while still separated from family and friends." (parentheses original)).  In a case like this that

has garnered intense national and international media attention, releasing juror names during the

pendency of trial threatens the integrity of the jurors' ability to absorb the evidence and later to

render a verdict based only on that evidence.  This is the case because disclosure increases the risk

of third-party contact by the press or by non-parties who are monitoring these proceedings through

the vast media attention this case has gathered.  Any such contact is presumptively prejudicial to

Defendants' right to a fair trial, *United States v. Harbin*, 250 F.3d 532, 544 (7th Cir. 2001)

(communications with jurors during the pendency of trial are presumptively prejudicial (citing

*Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954))) – and could give

rise to jury tampering.  The Supreme Court has noted the adverse effects that may accompany the

---

[12]     As an initial matter, that the press and public maintain a qualified right to attend
voir dire proceedings, however, does not necessarily mean that they also maintain a right to
access juror names.  The two issues are analytically distinct.  *See Corbitt*, 879 F.2d at 228-29
(The "press' right of access to documents submitted for use in a hearing must be considered
separately from the press' right to attend the hearing itself."  "Whether or not the public and the
press have a first amendment right of access to sentencing hearings, we must determine
independently whether there is a right to disclosure of presentence reports submitted at such
hearings.").

public disclosure of juror names during a high-profile trial:

> As a consequence [of publishing the names and addresses of the "veniremen"], anonymous letters and telephone calls, as well as calls from friends, regarding the impending prosecution were received by all of the prospective jurors. . . .
>
> *     *     *
>
> [N]umerous pictures of the jurors, with their addresses, which appeared in the newspapers before and during the trial itself exposed them to expressions of opinion from both cranks and friends. The fact that anonymous letters had been received by prospective jurors should have made the judge aware that this publicity seriously threatened the jurors' privacy.

*Sheppard v. Maxwell*, 384 U.S. 333, 342, 353, 86 S. Ct. 1507, 1512, 1517, 16 L. Ed. 2d 600 (1966).

There is no reason to suspect that disclosure would not have a similar effect in this highly-publicized case. Thus, while public scrutiny serves a positive function as to the majority of aspects of criminal proceedings,[13] the opposite is true regarding public disclosure of juror names during the pendency of trial.

The Tribune's cited authority does not counsel a different result. Citing *ABC, Inc. v. Stewart*, 360 F.3d 90 (2ᵈ Cir. 2004), the Tribune asserts that juror names in a high-profile case must be released during the pendency of trial:

> [B]oth objecting defendants repeatedly invoke the presence of a large contingent of media as a justification for secrecy. They are mistaken. . . . The defendant in the [*Stewart*] case was Martha Stewart, a defendant who, at least in this country (and with all due respect to Mr. Black), has a higher profile than any of the defendants in this case.

---

[13]     The grand jury process is the most notable exception to this rule. *See Press-Enterprise II*, 478 U.S. at 8, 106 S. Ct. at 2740 ("Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly. A classic example is that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.").

(R. 539-1, Tribune Reply at 3 (parentheses in original).)  In that case, the Second Circuit dealt with the closure of voir dire proceedings – again, a situation distinct from that currently before the Court. Without opining on whose profile looms larger among the press, the Court notes that in *Stewart*, the Second Circuit in effect approved the very method employed by the Court here as a permissible alternative to closing the entirety of voir dire proceedings to the press and public:

> Concerned as we are only with the case before us, we merely observe that, in this case, there were at least two available alternatives to complete closure that would have effectively addressed the district court's stated concern about the candor of prospective jurors.
>
> First, we do not see why simply concealing the identities of the prospective jurors would not have been sufficient to ensure juror candor.  Under the January 15 Order, members of the media can access transcripts of the voir dire examinations, redacted only to conceal the names of prospective and chosen jurors.  Venire members therefore could not speak openly and frankly free of any fear that their answers would be published, but only free of fear that their names would be published alongside their answers.  The district court suggested that referring to members of the venire panel by number in place of name would not have been an effective alternative to contemporaneous closure for two reasons: If members of the media had attended the voir dire proceedings, (1) they might somehow have discovered the names of the prospective jurors-defeating actual anonymity, and (2) potential jurors would have feared that their names would be discovered-undermining perceived anonymity.  We respectfully disagree with both conclusions.  Other courts have been able to conceal juror identity, without closing voir dire proceedings to the media, and there is no indication in the record of media misconduct that might differentiate this case from others.

*Id.*, at 104-05.  For these reasons, the Tribune has failed to establish that there is a logical connection – and there in fact is none – between public access to juror names during the pendency of the trial and the proper functioning of the jury.  *See also United States v. Edwards*, 823 F.2d 111, 120 (5th Cir. 1988) ("The usefulness of releasing juror names appears to us highly questionable.").

**B.** **Even if a First Amendment Right Existed, the Court Would Deny Public Access to the Jurors' Names To Preserve Defendants' Right to a Fair Trial**

Even if a qualified First Amendment guaranteed access to the jurors' names, there exists in this instance a higher right to preserve – namely, the Defendants' right to a fair trial. *See Waller*, 467 U.S. at 45, 104 S. Ct. at 2215; *Press-Enterprise I*, 464 U.S. at 508, 104 S. Ct. at 823. First, as noted above, to disclose the jurors' names in a high-profile trial such as this would create the unnecessary risk that, during the course of the trial, jurors will be subjected to improper and presumptively prejudicial contact. *See also Sheppard*, 384 U.S. at 362, 86 S. Ct. at 1522 ("Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused."); *see also United States v. Koubriti*, 252 F. Supp. 2d 418, 422 (E.D. Mich. 2003) (with a "heightened level of media attention, the potential for juror harassment is increased"). Such contact creates the risk that the jurors' verdict could rest on something other than the evidence admitted in this case. As recent history in this courthouse indicates, public disclosure of juror names during the pendency of a high-profile trial will increase the risk that external influences will be brought to bear on the jurors. *See, e.g., United States v. Warner*, No. 02 CR 506-1, 02 CR 506-4, 2006 WL 2583722, **49-51 (N.D. Ill. Sept. 7, 2006). Common sense further reveals that external influences will not be shouldered by the jurors alone, but will also be borne by the their families, friends, co-workers and employers. These costs should not unnecessarily accompany the fulfillment of civic duty, especially where, like here, they create a real and substantial risk of compromising Defendants' right to a fair trial.

Second, to transform jurors' personal lives into public news – especially where several jurors

have already indicated sensitivity to this issue[14] – could unnecessarily interfere with the jurors'

ability or willingness to perform their sworn duties.  *See also In re Globe Newspaper*, 920 F.2d at

95 ("[J]urors summoned from the community to serve as participants in our democratic system of

justice are entitled to safety, privacy and protection against harassment."); *Brown*, 250 F.3d at 918

("Ensuring that jurors are entitled to privacy and protection against harassment, even after their jury

duty has ended, qualifies as [a strong governmental] interest in this circuit.").  Moreover, public

reports discussing the jurors' specific identities (or other personal information about the jurors) also

would undermine the jurors' ability to adhere to the Court's repeated instructions not to read, watch,

or listen to any media coverage regarding this case.  The ease of accessing and distributing

information via the internet and the fact that potential juror contact could originate outside the

Court's jurisdiction amplify these risks.

Together these concerns counsel in favor of prohibiting access to juror names during the

pendency of trial, even assuming the Tribune has a First Amendment right to access those names.

*See Sheppard*, 384 U.S. at 363, 86 S. Ct. at 1522 ("[T]he cure lies in those remedial measures that

will prevent the prejudice at its inception.  The courts must take such steps by rule and regulation

that will protect their processes from prejudicial outside interferences."); *cf. Whitehead v. Cowan*,

263 F.3d 708, 721 (7th Cir. 2001) (in *Sheppard*, "the Supreme Court has found that publication of

juror names and addresses can contribute to the deprivation of a fair trial . . . [but] *Sheppard* does

not require a finding of presumed prejudice based on the publication of juror names and addresses

---

[14]	On both their jury questionnaires and during voir dire, several prospective jurors
expressed concern about the level of media scrutiny that this trial will entail, explaining that they
wanted to preserve their privacy and did not want the media questioning them or their families.
One prospective juror further explained that she feared that the age of the internet would only
compound the perceived threat to her family's privacy.

in the circumstances of this case").  Accordingly, the Court expects that the Tribune as well as all other media organizations covering this trial will continue to respect the jurors' privacy and the Defendants' related right to be tried by a jury free of outside influences.  Failure to do so, at a minimum, will expose individual members of the media and their affiliated organizations to the loss of media accreditation for the remainder of this trial.

## CONCLUSION

The Court denies the Tribune's motion to disclose the final jury list because there is no First Amendment right to access juror names during the pendency of trial. Rather, the Court maintains discretion in determining whether to disclose juror names. In light of the intense media scrutiny surrounding this case, the Court finds that releasing juror names unnecessarily threatens Defendants' Sixth Amendment rights.

Dated:  April 6, 2007                                    ENTERED

AMY J. ST. EVE
United States District Judge