AE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

*SEP 2 0 2005*
*JUDGE AMY ST. EVE*
*United States District Court*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 05 CR 727 |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| F. DAVID RADLER | ) | |

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, F. DAVID RADLER, and his attorney, ANTON R. VALUKAS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure, and is governed in part by Rule 11(c)(1)(C), as more fully set forth in Paragraph 16 below.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 05 CR 727.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, F. DAVID RADLER, and his attorney, ANTON R. VALUKAS, have agreed upon the following:

1.     Defendant acknowledges that he has been charged in Counts One through Seven of the Indictment in this case with mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.

2.     Defendant has read the charges against him contained in the Indictment and those charges have been fully explained to him by his attorney.

3.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

4.     Defendant will enter a voluntary plea of guilty to Count One of the Indictment in this case.

5.     Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the Indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt and relevant conduct beyond a reasonable doubt:

### Background

At times material herein:

Hollinger International, Inc. ("International"), was a Delaware corporation that had its nominal headquarters in Chicago. International also maintained executive offices in New York City and, until 2004, in Toronto. International owned and operated newspaper publishing businesses in the United States, Canada, and elsewhere. It owned the Chicago *Sun-Times*, as well as community newspapers in the Chicago area such as the *Daily Southtown*, the Joliet *Herald News*, the Waukegan *News Sun*, and the Aurora *Beacon News*. International also owned the *Daily Telegraph* in London, the *National Post* in Toronto, the *Jerusalem Post* and various other publications. International was,

and is, a publicly traded company on the New York Stock Exchange.

Hollinger, Inc. ("Inc."), was a Canadian corporation that owned interests in various corporations that operate newspapers and other publications around the world. Since International went public in 1994, Inc. has held at least a majority of International's voting rights, while usually owning less than 50% of International's equity. From 1999 through 2003, Inc. owned less than a majority of International's equity, but was nevertheless International's controlling shareholder. This is so because Inc. owned all of International's Class B common shares – either directly or indirectly through one of Inc.'s subsidiaries – and each Class B share has the right to cast 10 votes in any matter submitted for a shareholder vote, compared to one vote per share for the Class A common shares held by International's public investors. Although recent sales and financings involving Inc. have reduced Inc.'s ownership of International's equity to approximately 18%, Inc. still possesses approximately 68% of International's voting power. Inc. was, and is, a publicly traded company on the Toronto stock exchange.

Defendant owned an equity interest in both Inc. and International through a 14.1% ownership in co-defendant THE RAVELSTON CORPORATION LIMITED ("RAVELSTON"), which, through subsidiaries, owned a majority of Inc.'s stock and stock voting rights. RAVELSTON, a Canadian corporation, was a privately held corporation, with 98.5 % of its equity owned by officers and directors of International and Inc., and 1.5 % owned by the estate of a former Inc. director. RAVELSTON's controlling shareholder, who controlled RAVELSTON's affairs, was the Chairman and Chief Executive Officer of International and Inc. ("the Chairman"). Until recently, when RAVELSTON filed for bankruptcy, defendant was President of RAVELSTON. Defendant held this

interest in RAVELSTON for many years.

Defendant has held various positions over the years at International and Inc., although defendant is no longer involved in the management of either company. Between 1998 and 2003, defendant was the President and Chief Operating Officer of International. During that same period of time, defendant served as the President, and the Chief Operating Officer, of Inc. Defendant was also a member of the Board of Directors for both Inc. and International. For part of that time, defendant was the Deputy Chairman of both Boards of Directors. At International, defendant's principal duties were to manage the newspaper operations of the company in the United States and parts of Canada. On those occasions when International or its subsidiaries bought or sold newspapers, defendant often was involved in negotiating the business terms of those transactions. As an officer and director of International, defendant acknowledges that he knew he had a fiduciary duty of undivided loyalty to International, which among other things, required defendant to provide honest services to International, to refrain from acting to benefit himself or anyone else at International's expense, and to disclose all material facts to International's independent directors regarding any transactions involving International and any of International's officers, directors and controlling shareholders.

The top four executives of International were not employees of International, but rather of RAVELSTON. The services of these executives, along with certain accounting, financial reporting and other administrative functions, were provided by RAVELSTON to International pursuant to a management services agreement between the two companies. The management services agreement, which was signed by co-defendant KIPNIS on behalf of International, provided that International and

-4-

RAVELSTON would meet at least annually to determine whether RAVELSTON would continue to provide these services to International and at what fee. The fee was to be determined through negotiations between RAVELSTON and a committee of International's independent directors. In the agreement, RAVELSTON represented and promised that it would discharge its duties thereunder honestly, in good faith, and in the best interest of International. The agreement further stated that RAVELSTON would provide the details of any conflict of interest involving RAVELSTON's performance of its management services to the Secretary of International, namely KIPNIS, whose job and fiduciary duty it was to present all material facts concerning all related party transactions to International's Audit Committee for its review and approval.

International owned more than 300 community newspapers throughout the United States until 1998, when it began selling them. Based on numerous discussions that defendant had with RAVELSTON's agents in 1998 and 1999, defendant understood that these individuals intended to sell off International's community newspapers to raise capital for repaying debt, investing in internet ventures, and retiring International stock. Additionally, the Chairman advised defendant that he had "lost faith" in the newspaper business. Accordingly, from early 1999 through late 2000, International and its subsidiaries sold virtually all of International's United States community newspapers, in a series of sales to a variety of purchasers.

The closing documents for each of the transactions involving International's U.S. community newspapers included a non-competition agreement signed by International, whereby International promised not to acquire or establish a newspaper within a certain geographic distance from the newspapers it sold for a certain period of time after the sale. It was not unusual for transactions in

the newspaper business to include a non-competition agreement signed by the seller. This was done because newspaper purchasers buy not just the trade name of the newspaper, but also its subscriber and advertiser bases. Purchasers often request the seller's agreement not to return to the same area in a short period of time and operate a rival newspaper. For commercial and tax purposes, it is not unusual for the buyer and seller to allocate a portion of the sales proceeds towards the seller's non-competition agreement. In defendant's experience, however, the buyer typically does not pay additional consideration for a separate agreement that prohibits the seller's affiliates and officers from personally competing with the buyer.

At various times, International engaged in transactions involving Inc., RAVELSTON and other companies controlled by the Chairman and defendant. International also engaged in transactions involving RAVELSTON's agents and defendant. All of these transactions were related party transactions. Defendant understood, and he knew that KIPNIS and RAVELSTON's agents understood, that these transactions were required to be approved by the independent directors of International after the disclosure of all material facts. International policy was to present all related party transactions to International's Audit Committee, which consisted of three independent directors. After the Audit Committee approved a related party transaction, the transaction and the Audit Committee's action was approved by the board.

The Audit Committee and the board generally met in New York City, usually on the same day, with the Audit Committee meeting preceding the board meeting. Defendant and KIPNIS were regular attendees at the Audit Committee meetings. KIPNIS was required to attend because he was the secretary of the committee. Defendant's attendance was not required; defendant attended

because he usually was the only member of senior management who was available. As a general practice, KIPNIS presented all related party transactions to the Audit Committee. Defendant generally was there to answer questions about operations. Defendant acknowledges that the fact that it was KIPNIS's role and job to present all related party transactions to the Audit Committee did not obviate defendant's obligation, or the obligation of other International executives, to insure that such transactions were appropriately disclosed to the Audit Committee.

Starting in May of 1998, and continuing through 2000, International embarked on a business plan to sell off nearly all of its United States community newspaper assets. In May 1998, an International subsidiary sold a publication called *American Trucker* and several other smaller publications to Intertec Publishing Company for a total amount of approximately $75 million ("the *American Trucker* transaction"). In addition, from early 1999 through late 2000, International and its subsidiaries sold virtually all of International's United States community newspapers (except for those in the Chicago metropolitan area), in a series of sales to a variety of purchasers. These transactions were as follows:

| Purchaser | Total Amount (approx.) | Closing Date | Referred To Herein As |
|---|---|---|---|
| Community Newspaper Holdings Inc. | $472 million | 2/1/99 | "CNHI I" |
| Horizon Publications Inc. | $43.7 million | 3/31/99 | "Horizon" |
| Forum Communications Inc. | $14 million | 9/30/00 | "Forum" |
| PMG Acquisition Corp. | $59 million | 10/2/00 | "Paxton" |
| Newspaper Holdings Inc. | $90 million | 11/1/00 | "CNHI II" |

Newspaper Holdings Inc. was a subsidiary of Community Newspaper Holdings Inc.

## The Scheme

Beginning no later than in or about January 1999 and continuing thereafter until at least in or about May 2001, at Chicago, in the Northern District of Illinois, Eastern Division and elsewhere, defendant F. DAVID RADLER, along with co-defendants MARK S. KIPNIS and THE RAVELSTON CORPORATION LIMITED, and others, devised, intended to devise, and participated in a scheme to defraud International and International's public shareholders of money, property and their intangible right of honest services, to defraud the Canadian tax authorities of tax revenue, and to obtain money and property from these victims by means of materially false and fraudulent pretenses, representations, promises and omissions.

It was part of the scheme that RAVELSTON and its agents, including RADLER, the Chairman and others, repeatedly abused their authority and fiduciary obligations as managers of International in order to fraudulently benefit themselves at the expense of International and its public shareholders. On multiple occasions, RAVELSTON's agents fraudulently inserted themselves and Inc. as recipients of non-competition fees that should have, and otherwise would have, been paid exclusively to International. RAVELSTON and its agents failed to disclose their self-dealing to International's Audit Committee, thereby enabling RAVELSTON and its agents to conceal the scheme, continue as International's managers, and quietly siphon away International assets. RAVELSTON's agents also abused their positions as International's managers by fraudulently causing International to mischaracterize bonus compensation payments to them as non-competition fees, in order to defraud the Canadian tax authorities. KIPNIS aided and abetted this scheme by implementing the directives of RAVELSTON's agents and by failing to disclose this misconduct to

-8-

International's Audit Committee. As a result of this scheme, defendants and their co-schemers fraudulently diverted over $32 million from International, and fraudulently deprived International of its right to receive their honest services.

### American Trucker/Intertec Publishing Co.

On or about May 11, 1998, Southam (a subsidiary in which International owned a controlling interest) sold *American Trucker* and *Mine and Quarry Trader* publications to Intertec Publishing Corporation ("Intertec") for approximately $75 million in consideration. Defendant directed the negotiation of the *American Trucker* transaction including the purchase price. Defendant was aware that the Asset Purchase Agreement and the Unanimous Written Consent adopted by International's Executive Committee to authorize the transaction provided that $73 million of the proceeds would be allocated to the purchase price, and that $2 million of the sales proceeds would be allocated to a non-competition agreement between International and Intertec. Inc. was not a party to the transaction and to the best of defendant's knowledge Intertec never requested a non-competition agreement from Inc. In fact, defendant was not aware of any discussions prior to the closing of this deal in May 1998 in which any representative of International or Intertec discussed obtaining a non-competition agreement from Inc. or making any payments from the sales proceeds to Inc. for any reason. Defendant signed the non-competition agreement on behalf of International. The agreement did not mention Inc.

On or about January 27, 1999, defendant was copied on a memo from the Executive Vice-President of International's Community Newspaper Division to the Assistant Treasurer of International. The memorandum falsely stated that the $2 million from the *American Trucker* deal

allocated to International's non-competition agreement "was actually for [Inc.] as compensation for the Non-Compete as specified in the *American Trucker* transaction." Defendant knew that this was untrue at the time. Specifically, defendant knew that the $2 million designated for a non-competition agreement in the *American Trucker* transaction was supposed to go to International, not Inc. Defendant also knew then and now that there was no legitimate business reason for Inc. to receive $2 million for a non-competition agreement in the *American Trucker* transaction. Among other reasons, Inc. was not asked to sign such an agreement, had not signed such an agreement, and had no intention of operating in the U.S. except through International.

Defendant knew that the $2 million transfer of funds from International to Inc. occurred in or about early February 1999, and that it clearly was a related-party transaction that needed to be disclosed to the International independent directors. As such, defendant, KIPNIS and the International executives who knew about the payment, had a legal duty to advise the International independent directors of the details of this transaction and obtain its approval. Defendant never sought approval of the independent directors for this payment, and to the best of defendant's knowledge no one else did either. Defendant acknowledges that this payment could not have been truthfully justified to any independent director because Inc. had no right to the non-competition fee, and it was a clear breach of fiduciary duty by the International agents who were involved..

### CNHI I

On or about November 30, 1998, defendant presented to International's board the terms of a transaction involving the sale of certain Community Newspaper Group assets to CNHI for approximately $472 million. The CNHI transaction included, among other things, the execution by

International of a 3-year non-compete agreement. At the time that defendant presented the transaction to the board, the only non-compete covenantor of which defendant was aware was International.

Defendant participated in negotiating the principal terms of the CNHI transaction. The amount of International's non-compete fee ($50 million), however, was decided by RAVELSTON's agents in Toronto. All of the material terms of the CNHI transaction as defendant understood them in December 1998 were accurately summarized in a December 4, 1998 letter from CNHI to International. In that letter, signed by both parties, CNHI and International agreed to allocate $50 million of the $472 million purchase price to International's non-competition agreement.

In January 1999, defendant received a telephone call from RAVELSTON's agents in Toronto, who also were International executives. During that phone call, defendant was told to have Inc. inserted as a covenantor to the CNHI non-competition agreement, and to allocate $12 million of the $50 million non-competition fee from International to Inc. These individuals advised defendant that the parent company deserved a piece of the non-compete fee. Defendant understood that this decision was ultimately being made by the Chairman, since none of the other International executives were in a position to make a decision of this magnitude. Prior to this call, defendant had no idea that Inc. would be a covenantor to the non-compete, or that it would receive a non-compete payment. After defendant received this directive, defendant passed on the instructions to KIPNIS, who conveyed International's desire to CNHI. CNHI agreed to this approach, and Inc. was inserted as a covenantor. To the best of defendant's knowledge, prior to his direction to KIPNIS about inserting Inc., there had been no discussions about Inc. executing a non-compete agreement or Inc.

-11-

receiving a non-compete fee. Defendant signed the non-competition agreement on behalf of Inc.; KIPNIS signed for International. In early February 1999, the closing occurred, and Inc. received $12 million that, but for the insertion of Inc as a non-compete covenantor, would have been paid to International.

Around the time that the decision was made to include Inc. in the CNHI non-compete agreement, KIPNIS advised defendant that, at a meeting he attended in Toronto, it had been decided by "Toronto" that Inc. would be inserted as a non-compete covenantor in all future deals involving the sale of International's U.S. community newspapers, and that Inc. would receive 25 % of any non-compete payments.

Defendant confirmed that this was the "template" for future deals in subsequent conversations with RAVELSTON's agents. Given the fact that Inc. had no real intention of competing in the United States other than through International, there was no legitimate business reason why Inc. was entitled to a 25% share of these non-compete agreements. There certainly was no legitimate reason for International to insert Inc. as a covenantor and to give Inc. funds that otherwise would go to International. As the seller, it was in International's interest to limit the scope of the non-compete covenants, and to keep all of the non-compete payments for itself.

Defendant understood that the "template" was originated because it was better for RAVELSTON and its agents to have money going directly to Inc. rather than International because RAVELSTON's agents, through RAVELSTON, owned a larger share of equity in Inc. than in International. Defendant also learned that International's bank loan, which was secured by International's assets, contained covenants that restricted its ability to use the proceeds of assets sales

-12-

as it saw fit. By sending the money to Inc. as non-compete payments, RAVELSTON's agents were able to avoid these restrictions.

Defendant understood that the insertion of Inc. into the CNHI transaction as a recipient of a non-competition fee that otherwise would have gone to International, as well as the initiation of the plan to do so in future transactions -- that is, the initiation of the "template" -- were breaches of of the fiduciary duty that defendant, KIPNIS and the other RAVELSTON agents owed to International. In addition, the former was a related party transaction, and the latter was a plan to engage in a series of related party transactions. Defendant acknowledges that he (and any International officer or employee who knew about these events) had a fiduciary obligation to present all the facts regarding the CNHI payment, as well as the "template," to the independent directors for their approval. Defendant understood that neither the CNHI payment, nor the "template," would ever be truthfully disclosed to the independent directors because of their obvious impropriety. International's agents, including defendant, had made the unilateral decision to affirmatively insert Inc. as a recipient of millions of dollars that otherwise would be paid to International. There was no way to truthfully disclose and justify these actions to International's independent directors. Defendant never disclosed the facts relating to these decisions to the independent directors of International and, to the best of his knowledge, no one else did either.

### Horizon

Horizon was a privately-owned newspaper company in which defendant and other RAVELSTON agents owned substantial interests. In a transaction agreement dated March 31, 1999, International agreed to sell certain newspapers and specialty publications to Horizon for

-13-

approximately $43.7 million. RAVELSTON's agents decided that the amount allocated to the non-competition agreement would be $5 million, and that, pursuant to the template, both International and Inc. would sign the non-competition agreement, with International receiving $3.8 million of the non-competition allocation and Inc. receiving $1.2 million of the non-competition allocation.

At the closing of the Horizon transaction, KIPNIS helped implement the template by including Inc. in the transaction documents, and causing $1.2 million to be wire transferred to Inc. in August 1999 when Horizon received the funding necessary to close the transaction. KIPNIS signed the asset purchase agreement and non-competition agreement on behalf of International, and defendant signed the non-competition agreement on behalf of Inc. Thus, in the Horizon transaction, RAVELSTON's agents had in essence, negotiated an agreement with themselves (Inc.), not to compete against themselves (Horizon), resulting in them paying themselves (Inc.) approximately $1.2 million.

Defendant admits that the $1.2 million payment to Inc. was a breach of the fiduciary duty that defendant, KIPNIS and RAVELSTON's agents owed to International, which required them to seek to maximize the benefit to International from the transaction. Defendant knew at the time of the Horizon transaction that there was no legitimate reason for Inc. to have been inserted as a non-compete covenantor, or for Inc. to have received $1.2 million as a non-compete fee. This was especially true since defendant and other RAVELSTON agents were involved at Horizon, as well as International and Inc.

Defendant further acknowledges that the insertion of Inc. as a recipient of a non-compete payment in the Horizon transaction was a related party transaction for which defendant, KIPNIS and

-14-

other RAVELSTON agents were required to seek approval by the independent directors of International after full disclosure of all material facts. Nevertheless, defendant concedes that there was no way to truthfully justify to any independent director the insertion of Inc. into this deal, and the diversion to Inc. of $1.2 million that otherwise would have gone to International. Accordingly, defendant did not disclose this related party transaction and, to the best of his knowledge, neither did KIPNIS or any other RAVELSTON agent who knew about the payment.

## Individual Non-Competes

In the summer of 2000, defendant and three of International's officers, all of whom were RAVELSTON's agents, decided that, with respect to anticipated sales of U.S. Community newspapers in the Forum, Paxton and CNHI II transactions, they would insert themselves as individual non-compete covenantors and would divert a portion of the proceeds of each of these transactions to themselves as bonus compensation. The decision to characterize these payments as "non-competition" payments, as opposed to bonus compensation, was motivated, at least in part, by a desire by certain International officers to mislead the tax authorities in Canada, where legitimate non-competition payments potentially received tax-advantaged treatment. These payments were designed to be above and beyond the funds allocated to the non-competition agreement in the transaction by the parties, which would continue to be divided between International and Inc. pursuant to the template. Defendant was tasked with making sure that these amounts were set aside by the chief financial officer of American Publishing, the International subsidiary that was the seller in the CNHI II, Paxton and Forum transactions. Defendant informed KIPNIS, who had primary

-15-

responsibility for drafting the documents for these deals, of this new plan for individual non-compete payments.

It was obvious to defendant that this plan to insert International executives as recipients of non-compete fees, thereby diverting to defendant and other International executives funds that otherwise would go to International, was a breach of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from these transactions. It also was a related party transaction for which defendant, KIPNIS and other RAVELSTON agents were required to seek approval by the independent directors of International after full disclosure of all material facts. Defendant understood that this plan could never be fully and truthfully disclosed to International's independent directors because there would be no way to convince the Audit Committee to approve a plan to affirmatively insert International executives as non-compete recipients without the buyer making it a condition of the deal. This was especially true given that defendant and other RAVELSTON agents also intended to continue the "template" of inserting Inc. as a recipient of 25 % of the total negotiated non-compete fee for each deal. Defendant never disclosed the facts relating to this plan to the independent directors of International and, to the best of his knowledge, no one else did either.

### CNHI II

Defendant acknowledges that on or about November 1, 2000, International sold additional newspapers to CNHI for approximately $90 million. Pursuant to the "template" established by RAVELSTON's agents, Inc. was inserted by KIPNIS into the CNHI asset purchase agreement as a non-compete covenantor and received 25 % of the negotiated non-competition payment. The asset

-16-

purchase agreement, dated September 28, 2000, allocated $3 million of the purchase price to International and Inc.'s non-competition agreements — $2.25 million to International (75%) and $750,000 to Inc. (25%). Inc. was included as a non-compete covenantor because KIPNIS, purportedly acting on behalf of International, inserted it as such. To the best of defendant's knowledge, CNHI never requested that Inc. be included.

Several weeks prior to the closing, defendant instructed KIPNIS that defendant and three other International executives were to be included as non-compete covenantors in the transaction, and were to receive non-compete fees. A few days prior to the closing, defendant had a telephone conversation with other RAVELSTON agents, who directed defendant to set aside $9.5 million for the individual non-competition payments for the four International officers – all of which otherwise would have been paid to International – and directed defendant as to how to allocate the $9.5 million among the four. Defendant conveyed these instructions to KIPNIS. Defendant instructed KIPNIS to sign the individual non-competition agreements on behalf of the four International executives. At or near the date of the closing, KIPNIS, purportedly acting on behalf of International, advised CNHI representatives that International wanted to insert the four International officers, including defendant, as covenantors to the non-competition agreement (in addition to International and Inc.). CNHI acceded to this request. KIPNIS further sought to have CNHI pay the $9.5 million directly to the four International executives. CNHI refused. KIPNIS signed the non-competition agreement on behalf of the four International executives, International and Inc.

Defendant acknowledges that the insertion of defendant and the three other International officers as non-compete fee recipients in the CNHI II deal, thus diverting $9.5 million from

International to the four executives, was a breach of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from this transaction. Defendant further acknowledges that the insertion of Inc., and its receipt of $750,000 non-compete fee that otherwise would have been paid to International, also was a clear breach of fiduciary duty. In addition, both were related party transactions. Defendant acknowledges that he (and any International officer or employee who knew about these events) had a fiduciary obligation to present all the facts regarding these payments to International's independent directors for their approval. Defendant understood that neither the payment to Inc., nor the payments to the International executives, would ever be truthfully disclosed to the independent directors because of their obvious impropriety. International's agents, including defendant, had made the unilateral decision to affirmatively insert Inc. and themselves as recipients of millions of dollars that otherwise would be paid to International. There was no way to truthfully disclose and justify these actions to International's independent directors. Defendant never disclosed the facts relating to these decisions to the independent directors of International and, to the best of his knowledge, no one else did either. Defendant did not report this money as income on his Canadian income tax return for the year 2000.

### Forum and Paxton

On or about September 30, 2000, International entered into an Asset Purchase Agreement to sell certain newspapers to Forum Communications Co. for $14 million, $400,000 of which was allocated to non-competition agreements. On or about October 2, 2000, International entered into an Asset Purchase Agreement to sell certain newspapers to Paxton for approximately $59 million, $2 million of which was allocated to non-competition agreements. Pursuant to the template

established by RAVELSTON's agents, in both transactions KIPNIS inserted International and Inc. as non-compete covenantors, and proposed that the amount allocated to the non-competition agreement be split 75% to International and 25% to Inc. To the best of defendant's knowledge, neither Forum nor Paxton ever requested that Inc. be included as a non-compete convenantor. KIPNIS signed the non-competition agreements on behalf of Inc. with defendant's authorization.

At the time of the Forum and Paxton transactions, defendant believed that, consistent with their plan, the four International officers, including defendant, had been inserted as non-compete covenantors by KIPNIS in the Forum and Paxton closing documents, and that 3 % of the proceeds of each transaction had been set aside to fund the non-compete payments to the four International officers.

In the spring of 2001, RAVELSTON's agents telephoned defendant and inquired about the individual non-compete payments from the Paxton and Forum transactions. After an investigation, which included a discussion with KIPNIS, defendant and RAVELSTON's agents realized that a portion of the proceeds from the Forum and Paxton transactions had not, in fact, been set aside from the transactions to fund the anticipated individual non-compete payments. After realizing that there had been a miscommunication, defendant examined International's reserve accounts from the Forum and Paxton transactions – which had closed almost six months prior – and determined that $600,000 could diverted from those reserves and paid to the four International officers, including defendant, as non-competition payments. Accordingly, on or about April 9, 2001, defendant caused a subsidiary of International to pay a total of $600,000 to the four International officers, including defendant, as "supplemental non-competition payments." The "supplemental non-competition payments" were

made to International officers despite the fact that no individual had signed a non-competition agreement in connection with the Forum or Paxton transactions. Defendant did not report the receipt of this money as income on his 2001 Canadian tax return.

Defendant acknowledges that the payments to Inc. and to the International executives were breaches of fiduciary duty, as well as related party transactions, because they were made pursuant to a plan to insert Inc. and the individuals as recipients of non-compete fees that otherwise would have accrued to International's benefit. But equally obvious to defendant was the fact that no one was going to disclose the facts relating to these payments to the International independent directors, because to do so would be to identify misconduct by defendant and other RAVELSTON agents. To the best of defendant's knowledge, no one disclosed to International's independent directors the fact that International's executives had inserted themselves as recipients of these non-compete payments.

### February 2001 Payments

Sometime toward the end of 2000, defendant and three International executives decided that they would pay themselves, purportedly on behalf of International, a bonus of $5.5 million. Defendant and the three International officers further decided to label these payments as non-competition payments, rather than bonus compensation, in order to take advantage of the potential tax benefits that genuine non-competition payments received under Canadian tax laws.

KIPNIS helped implement this decision by preparing non-competition agreements between American Publishing Company (an International subsidiary) and each of the four International officers (including defendant), and then signing the agreements on behalf of American Publishing Company. In the agreements, which were backdated to December 31, 2000, each of the four

International officers promised not to compete with American Publishing Company for three years after he left International's employ. Defendant knew when he signed the non-compete agreement, however, that these agreements were a contrivance created to make it appear as if the payments were legitimate non-compete payments, when in fact they were bonuses. American Publishing Company was the subsidiary through which International had owned its United States community newspapers outside the Chicago area. By the time these agreements were signed, however, defendant was aware that International had sold virtually all of these newspapers. International was in the process of attempting to sell that newspaper and had no intent of re-entering the community newspaper business in the United States, and defendant knew that there was no legitimate justification for these non-competition agreements. The four International officers (including defendant) had signed a $5.5 million agreement not to compete in the newspaper business with a company that was, for all intents and purposes, no longer in the newspaper business. Thus, the International executives' promise not to compete against American Publishing was an empty promise, and certainly did not justify the payments that the International executives received.

In February 2001, KIPNIS caused the non-competition agreements and checks to be delivered to defendant and the other International executives. The issuance of these checks, as well as the preparation and signing of the fraudulent non-competition agreements, were breaches of the fiduciary duty owed by defendant, KIPNIS and their co-schemers because they were benefitting themselves to the detriment of International.

Defendant understood that the payments were actually bonus payments to himself and other International executives. Defendant was aware that certain International executives were convinced

that there were significant tax advantages to them from mischaracterizing these bonus payments as "non-competition fees." Defendant did not report the payment to him as income on his Canadian income tax return. At the time, defendant did not believe that he would personally benefit from this mischaracterization, although defendant now believes that he did.

Defendant acknowledges that KIPNIS, RAVELSTON's agents and defendant used the United States mail, commercial interstate couriers and the interstate wires to execute the above-described scheme. For example, KIPNIS sent transaction documents to others by interstate facsimile, e-mail and commercial interstate couriers. Money was wire transferred in interstate commerce. Checks were delivered by commercial interstate carriers. KIPNIS sent out packages of materials to the International Audit Committee by facsimile, e-mail and commercial interstate carriers.

On or about February 8, 2001, at Chicago, in the Northern District of Illinois, Eastern Division, defendant F. DAVID RADLER, and co-defendants MARK S. KIPNIS and THE RAVELSTON CORPORATION LIMITED, for the purpose of executing and attempting to execute the above-described scheme, did knowingly cause to be deposited for delivery by an interstate carrier from Chicago, Illinois, an envelope addressed to the Executive Vice-President of Inc. and International in Toronto, Canada, to be sent and delivered by an interstate carrier, namely, Federal Express, according to the directions thereon, which envelope contained Noncompetition Agreements with American Publishing Company to be executed by certain International officers, and approximately $2.9 million in checks as consideration for those agreements, in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

The factual summary contained in this paragraph is provided for the sole purpose of establishing a factual basis for defendant's plea of guilty. It does not contain all information known to the defendant regarding the offenses of conviction and other criminal conduct.

6.    For purposes of calculating the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

(a)    The guideline calculation is governed by the November 1, 2000 edition of the Guidelines Manual.

(b)    The base offense level for the offense of conviction is six pursuant to Guideline § 2F1.1(a).

(c)    The offense conduct resulted in a foreseeable loss in excess of $20,000,000. Therefore, a sixteen-level increase is appropriate pursuant to Guideline § 2F1.1(b)(1)(Q).

(d)    Pursuant to Guideline § 2F1.1(b)(2), an additional two-level increase is appropriate because the offense involved more than minimal planning and a scheme to defraud more than one victim.

(e)    Pursuant to Guideline § 2F1.1(b)(6)(C), an additional two-level increase is appropriate because the offense involved sophisticated means.

(f)    Pursuant to Guideline § 3B1.3, an additional two-level increase is appropriate because the defendant abused a position of public and private trust.

(g)    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional

evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of Guideline § 3E1.1, a 2-level reduction in the offense level is appropriate.

(h) Defendant timely provided complete information to the government concerning his own involvement in the offense and timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently, within the meaning of Guideline § 3E1.1(b); an additional 1-level reduction in the offense level is therefore appropriate, provided the court determines the offense level to be 16 or greater prior to the operation of Guideline § 3E1.1(a).

(i) Based on the facts known to the government, defendant has no criminal history points and defendant's criminal history category is I.

(j) Defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. Defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

7. Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected

by such corrections, and defendant shall not have a right to withdraw his plea on the basis of such corrections.

8.     Defendant understands that, in imposing sentence, the Court will be guided by the United States Sentencing Guidelines. The defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

9.     Defendant understands that the offense to which he will plead guilty carries a maximum penalty of five years' imprisonment; a maximum fine of $250,000, or twice the gain or loss, whichever is greater; a maximum term of supervised release of three years; and any restitution ordered by the Court.

10.     Defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, defendant will be assessed $100 on each count of conviction, in addition to any other penalty imposed. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or a money order made payable to the Clerk of the U. S. District Court.

11.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a)     If defendant persisted in a plea of not guilty to the charge against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

-25-

(b)     If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously, considering each count of the indictment separately, before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, and considering each count separately, it was persuaded of defendant's guilt beyond a reasonable doubt.

(c)     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count of the indictment separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d)     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e)     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

12.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.

13.     Defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction or the manner in which that sentence was determined, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives his right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

14.     Defendant agrees he will fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate.

(a)     Defendant agrees to appear and provide complete and truthful information in any investigation and pre-trial preparation, and complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding, and any related civil, administrative or court proceeding.

(b)     Defendant agrees to cooperate fully with representatives of the SEC in connection with any investigation and litigation regarding his conduct set forth in this agreement.

-27-

Such cooperation includes the production of documents, providing complete and truthful information in any investigation and pre-trial preparation conducted by the SEC, and providing complete and truthful testimony, if called upon by the SEC to testify, before any United States District Court proceeding, and any related civil administrative or court proceeding.

      (c)    Defendant agrees to postpone his sentencing until after the conclusion of the prosecution of defendants in this or any related criminal proceeding. However, the parties have agreed that should the criminal proceeding(s) in which defendant's testimony is required by the government become inordinately delayed, the government will agree to proceed with the sentencing of defendant.

15.    Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

16.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation, and, assuming the defendant's full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable advisory sentencing guideline range and to impose the sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable advisory guideline range rests solely with the Court. However, this Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment of twenty-nine months in the

custody of the Bureau of Prisons and a fine of $250,000. Other than this agreed term of incarceration and the agreed fine, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration and fine set forth herein, the defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(c)(3), (4) and (5). If, however, the Court refuses to impose the agreed term of incarceration and fine set forth herein, thereby rejecting the Plea Agreement, or otherwise refuses to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

17.     Should defendant elect to file an application for the International Prisoner Transfer Program pursuant to 18 U.S.C. §§ 4100 – 4115, the United States Attorney's Office for the Northern District of Illinois agrees to take no position on defendant's application. If in deciding what position they should take, the Department of Justice or the Bureau of Prisons requests factual information from the United States Attorney's Office for the Northern District of Illinois, the Office will provide them such information, but will neither support nor oppose any application by defendant for the International Prisoner Transfer Program.

18.     Defendant will at all times unconditionally agree to return voluntarily to the United States (or waive any extradition proceedings) for any required court appearance(s) or as required by the government pursuant to this agreement (including any necessary testimony or pre-trial preparation).

19.     Defendant understands that the Indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

20. Regarding restitution, defendant agrees that the offense to which he is pleading guilty is an offense against property and that restitution for the loss is required pursuant to Title 18, United States Code, Section 3663A. The government believes that defendant has made full restitution. Defendant understands that Title 18, United States Code, Section 3664 and Sections 5E1.1 and 5E1.2 of the Sentencing Guidelines set forth the factors to be weighed in setting a fine and in determining the schedule according to which restitution, if any, is to be paid in this case. Defendant agrees to provide full and truthful information to the Court and United States Probation Officer regarding all details of his economic circumstances. Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the court.

21. Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or to resentence defendant. Defendant understands and agrees that in the event that this Plea Agreement is breached by defendant, and the Government elects to void the Plea Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this agreement and the commencement of such prosecutions.

22.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

23.    The United States agrees not to seek additional criminal charges in the Northern District of Illinois against the defendant for any criminal acts concerning defendant, Hollinger International, Inc. and Hollinger-related entities, currently known to the United States Attorney's Office for the Northern District of Illinois, and which he has described in his proffer statements provided to the United States. However, nothing in this Agreement limits the United States in prosecution of the defendant in other districts or for crimes not disclosed in his proffer statements, except as expressly set forth in this Agreement.

24.    Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

25.    After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to this defendant.

26.    Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

27. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: 9|20|05

_____
PATRICK J. FITZGERALD
United States Attorney

_____
F. DAVID RADLER
Defendant

_____
ERIC H. SUSSMAN
Assistant United States Attorney

_____
ANTON R. VALUKAS
Attorney for Defendant

-32-