**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05 CR 727 |
| | ) | |
| CONRAD M. BLACK, JOHN A. | ) | |
| BOULTBEE, PETER Y. ATKINSON, and | ) | |
| MARK S. KIPNIS, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On July 13, 2007, after extensive pretrial proceedings, approximately four months of trial, and two weeks of jury deliberations, a jury convicted Defendants Conrad Black, John Boultbee, Peter Atkinson, and Mark Kipnis on several counts in the Superseding Information, and acquitted them on multiple counts, as well. Defendants now seek judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Defendant Black's, Boultbee's and Atkinson's motions are denied in their entirety. Defendant Kipnis' motion for judgment of acquittal is denied in part and granted in part as to Count Seven. Defendant Kipnis' motion for a new trial is denied.

## BACKGROUND

### I.     Hollinger International, Inc. and The Defendants

Defendants were executives at Hollinger International, Inc. ("International"), a Delaware corporation with an office located in Chicago, Illinois. Defendant Conrad M. Black ("Black")

1

served as Chief Executive Officer and Chairman of the Board of International.  He also

indirectly owned approximately 15% of International though his ownership in Hollinger Inc.

("Inc."), a holding company.  Defendant John A. "Jack" Boultbee, ("Boultbee"), a Canadian

citizen and a Chartered Accountant in Canada, served as Executive Vice President and, for a

period of time, Chief Financial Officer of International.  Defendant Peter Y. Atkinson

("Atkinson"), a Canadian citizen and licensed attorney in Canada, served as Executive Vice

President of International.  Defendant Mark S. Kipnis ("Kipnis"), a United States citizen and an

attorney licensed to practice law in Illinois, served as Vice President, Corporate Counsel and

Secretary of International.  Defendant F. David Radler ("Radler") was a Canadian citizen who

served as the President and the Chief Operating Officer of International.  Defendant Radler pled

guilty on September 20, 2005 to Count One of the Indictment, agreed to cooperate with the

government, and testified at trial.  (R. 21-1).

Defendant the Ravelston Corporation Limited ("Ravelston") was an Ontario, Canada

corporation with its principal office located in Toronto, Canada.  Ravelston was a privately held

corporation, with 98.5% of its equity owned by officers and directors of International and Inc.,

and 1.5% owned by the estate of a former Inc. director.  Ravelston had a controlling interest in

Inc.  Through this interest in Inc., Ravelston was the controlling shareholder of International.

Ravelston pled guilty to Count Two of the Third Superseding Indictment pursuant to a written

plea agreement on March 5, 2007.  (R. 503-1).

During the relevant time period, International was publicly traded on the New York

Stock Exchange.  International, through its operating subsidiaries, owned and published

newspapers around the world, including the *Chicago Sun-Times*, *The Daily Telegraph* in the

United Kingdom, the *National Post* in Toronto, Canada, the *Jerusalem Post* in Israel, and numerous community newspapers in the United States and Canada.

## II.     The Charges

On August 17, 2006, a grand jury returned a seventeen-count Third Superseding Indictment (the "Indictment") against Defendants Black, Boultbee, Atkinson, Kipnis, and the Ravelston Corporation Limited.  On January 10, 2007, the government filed a Superseding Information (the "Information") removing some allegations from the Indictment.  (R. 407-1).  The Information charged Defendants with committing the following offenses:  (1) mail and wire fraud, in violation of 18 U.S.C. §§1341, 1343, including the deprivation of the intangible right to honest services, in violation of 18 U.S.C. §1346; (2) money laundering, in violation of 18 U.S.C. §1957; (3) obstruction of justice, in violation of 18 U.S.C. §1512(c)(1); (4) racketeering, in violation of 18 U.S.C. §1962(c); and (5) criminal tax violations, in violation of 26 U.S.C. §7206(2).  Before turning to the merits of Defendants' motions, the Court will generally address the substance of the charges in the Information in order to put the evidence at trial in context.

### A.     The Non-Competition Agreement Charges

Counts One through Nine charged mail and wire fraud schemes, including the deprivation of the intangible right to honest services.  The thrust of the government's evidence at trial pertained to these counts which involved a scheme to defraud International through the execution of non-competition agreements.  The non-competition agreements were executed by Defendants in connection with International's sale of its United States community newspaper assets.  In connection with the sale of these assets, International executed non-competition agreements in which it agreed not to acquire or establish a newspaper within a certain

geographic distance from the newspapers it sold for a certain period of time after the sale at issue.  The government charged that Defendants abused this process to benefit themselves at the expense of International's shareholders by misappropriating non-competition fees that should have, and otherwise would have, been paid exclusively to International.  The Information alleged that Defendants used various methods to accomplish the charged scheme:  (1) improperly diverted money from a non-competition agreement with International; (2) improperly inserted Inc. into the non-competition agreements associated with International's sale of assets; (3) improperly inserted themselves as individual officers into non-competition agreements in connection with the sale of International's assets; and/or (4) created non-competition agreements that were not connected to the sale of the community newspapers.

### B.  The Perquisites Scheme

Counts Ten through Twelve charged Defendants Black and Boultbee with a scheme to defraud International and its shareholders by abusing certain perquisites, including International's corporate residence in New York City, International's corporate jet, and International's reimbursement of Black's business-related entertainment expenses, including a birthday party for his wife.  At the close of the evidence, the Court granted part of Defendant Boultbee's motion for judgment of acquittal regarding these counts.  (Trial Transcript ("Tr.") at 13421-22.)

### C.  Money Laundering

Count Thirteen of the Information charged Defendant Black with money laundering, in violation of 18 U.S.C. § 1957.  On May 30, 2007 after the close of the government's case, the government moved to dismiss Count Thirteen of the Information, and the Court granted the

motion.  (R. 683-1).

### D.    Obstruction of Justice

Count Fourteen[1] charged Defendant Conrad Black with obstruction of justice by concealing documents from an official proceeding, in violation of 18 U.S.C. § 1512(c)(1).  The evidence pertained to Defendant Black's removal of 13 boxes of documents from his office at 10 Toronto Street in an attempt to conceal the documents from an "official proceeding."

### E.    RICO

Count Fifteen charged Defendant Black with a RICO violation, alleging that he conducted and participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.  This charge was premised on the non-competition agreements in connection with the sale of International's community newspapers.

### F.    Tax Charges

Finally, the remaining counts charged Defendants with willfully procuring and assisting in the preparation of false and fraudulent United States corporation tax returns for International. At the close of the evidence, the government dismissed the tax charge in Count Sixteen of the Information against Defendant Atkinson only.

### G.    The Verdict

The jury commenced its deliberations on June 27, 2007.  (R. 772-1.)  After two weeks of

---

[1] Because the government dismissed Count Thirteen of the Information before the case went to the jury, the obstruction of justice count was renumbered as Count Thirteen for the jury. The Court provided the jury with a redacted Information removing the money laundering count in Count Thirteen and renumbering the remaining Counts of the Information accordingly.  (R. 766-1.)

deliberations, the jury returned its verdict on July 13, 2007, finding as follows:

* Defendant Conrad Black guilty of Counts One, Six, Seven and Thirteen, and not guilty of Counts Five, Eight, Nine, Ten, Eleven, Twelve, Fourteen, Fifteen and Sixteen;

* Defendant John Boultbee guilty of Counts One, Six, and Seven, and not guilty of Counts Five, Eight, Nine, Ten, Eleven, Twelve, Fifteen, and Sixteen;

* Defendant Peter Atkinson guilty of Counts One, Six and Seven, and not guilty of Counts Five, Eight, Nine and Sixteen; and

* Defendant Mark Kipnis guilty of Counts One, Six and Seven, and not guilty of Counts Two, Three, Four, Five, Eight, Nine, Fifteen and Sixteen.

In other words, Defendants were found not guilty of six of the nine non-competition agreement charges, all of the perquisites charges, the RICO charge and all of the tax charges. The jury found Defendants Black, Boultbee, Atkinson, and Kipnis guilty of the non-competition charges relating to non-competition agreements with Radler, Black, Boultbee and Atkinson and American Publishing Company, and the "supplemental payments" from the transactions with Forum Communications and Paxton. The jury also found Defendant Black guilty of obstruction justice.

## ANALYSIS

## I. Judgment of Acquittal

Each Defendant asserts that he is entitled to a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). Under Rule 29, a court must enter a judgment of acquittal if, after considering all the evidence in the light most favorable to the Government, it concludes that "the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005) (internal citation and quotation omitted). Where the defendant

challenges the sufficiency of the evidence presented at trial, the court must "consider the evidence in the light most favorable to the prosecution, drawing all reasonable inferences in the government's favor," and a "[r]eversal is appropriate only when, after viewing the evidence in such a manner, no rational jury could have found the defendant to have committed the essential elements of the crime." *United States v. Macari,* 453 F.3d 926, 936 (7th Cir. 2006) (internal quotation omitted). *See United States v. Emerson*, __ F.3d. __ , 2007 WL 2566005, at *3 (7th Cir. 2007) ("[w]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.)"

Defendants argue that they are entitled to judgment of acquittal on each count of conviction. Defendants cannot meet their heavy burden under Rule 29, with the exception of Mark Kipnis on Count Seven.

### A. Judgment of Acquittal is Not Appropriate on Counts One and Six

The jury convicted Defendants or the mail fraud counts charged in Counts One and Six of the Information. Regarding both counts, the government pursued two separate theories: (1) a theory of participating in a scheme to obtain money or property by means of materially false pretenses, representations, or promises; and (2) a theory of participating in a scheme to deprive Hollinger International and its public shareholders of their intangible right to the honest services of the corporation's officers, directors and/or controlling shareholders.

In order to prove mail fraud, the government must prove the following beyond a reasonable doubt: (1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme to defraud. *See United States v. Sloan*, 492 F.3d 884, 890

(7th Cir. 2007); *United States v. Leahy,* 464 F.3d 773, 786 (7th Cir. 2006). In order to establish that the scheme or artifice to defraud involved the deprivation of the intangible right to honest services, the government must prove that the defendant misused his position for private gain. *See United States v. Thompson*, 484 F.3d 877, 883-84 (7th Cir. 2007); *see also United States v. Segal*, 495 F.3d 826, 834-35 (7th Cir. 2007).

### 1. The Evidence Supports the Verdict

Both Counts One and Six pertain to mailings in connection with non-competition agreements between American Publishment Company ("APC") and Defendants Black, Boultbee, and Atkinson and co-schemer Radler, totaling $5.5 million. Viewing the evidence in the light most favorable to the government, these payments were bonus payments fraudulently disguised as non-competition payments. Specifically, the evidence established that APC was a subsidiary of International. (Tr. at 3127.) In February 2001 – after receiving over $25 million in non-competition payments from the sale of International's community newspapers to various companies – co-schemer Radler and Defendants Black, Boultbee, Atkinson executed individual non-competition agreements to enrich themselves in the amount of $5.5 million. They labeled these payments as non-competition payments – instead of bonuses – in order to take advantage of potential tax benefits under Canadian tax laws. Yet unlike the other non-competition agreements that Defendants executed in connection with the sale of community newspapers and the other charges in the Information, the APC agreements did not involve the sale of any of International's assets. There was no seller, no buyer, no closing, and no transaction. Instead, Defendant Kipnis drafted non-competition agreements for the four individuals, and those individuals pocketed $5.5 million in purported non-competition payments. Furthermore, neither

the Audit Committee or International's Board of Directors asked for, or knew about, the non-competition agreements – Defendants initiated and executed the fraudulent non-competition agreements on their own.

Of the $5.5 million, Black and Radler each received $2,612,500, (Gov. Exs. APC 9, 10, 11, 12), and Atkinson and Boultbee each received $137,500. (Gov. Exs. APC 14, 16.) Although the transaction took place in 2001, the checks were back-dated to December 31, 2000, at co-schemer Radler's direction. (Gov. Exs. APC 5, 9, 10, 12, 14.)

The evidence demonstrated that Kipnis prepared the agreements and signed them on behalf of APC. The agreements – back-dated to December 31, 2000 – provided that Defendants Black, Boultbee, and Atkinson, and co-schemer Radler would not compete with APC for three years after they left International's employ. (Gov. Exs. APC 8, 11, 13 &15.) Significantly, at the time they signed these "non-competition" agreements with APC, APC only owned one small weekly community newspaper in Mammoth Lake, California, that APC planned to sell, and eventually sold for only one dollar plus working capital. (Tr. at 7941, 7943-44, 9624-25; Gov. Ex. APC 18). Moreover, APC did not intend to re-enter the community newspaper business in the United States. In other words, Defendants received $5.5 million not to compete even though there was essentially nothing to compete against. Furthermore, the non-competition agreements were executed with International's own subsidiary, APC. In essence, Defendants paid themselves not to compete with themselves.

International's Audit Committee had the responsibility to review and approve related-party transactions. (Tr. at 5384, 6033-34.) Nonetheless, Defendants did not present the APC payments to the Audit Committee for approval before they were made and the Committee did

not approve them.  (*Id.* at 5552, 5574-75, 5806, 6095-99, 6761, 6784, 3780-81.)  In fact, the Audit Committee members were unaware of the agreements and payments.  (*Id.*)  Defendants acted in their own best interests by taking $5.5 million in a related-party transaction without approval from the Audit Committee or Board of Directors, not in the best interest of International despite the fact that they had a duty of loyalty to act in the corporation's best interests and to refrain from taking actions that either conflict with the corporation's interests or that harm the corporation.

None of Defendants disclosed the APC payments in their Proxy Questionnaires for fiscal year 2000 or 2001.  (Gov. Exs. Filing 1, 4, 5, 7, 8.)  The payments were also not accurately disclosed in International's Form 10-K.  The only disclosure in the April 2002 Form 10-K referred to payments made "in connection with the sales of United States newspaper properties in 2000" and "to satisfy a closing condition."  The APC payments were neither.  This evidence supports an intent to defraud International because if Defendants had believed the payments were legitimate, they would not have misrepresented the true nature of the payments to shareholders in public filings.

Furthermore, in November 2003, Defendant Kipnis told Jonathan Rosenberg – an attorney at O'Melveny & Myers who worked for the Special Committee of International investigating the non-competition agreements – that the APC payments were "silly."  (Tr. at 9436-37.)  Kipnis admitted to Rosenberg that APC had only one small newspaper and that "there'd be no reason for any of the individuals to compete with American Publishing Company even in the unlikely event they were to leave" their current positions.  (*Id.* at 9437.)  Kipnis further acknowledged that the non-competition agreements with APC were not a condition of

closing for any newspaper deal.  (*Id.* at 9437.)

Viewing this evidence in the light most favorable to the government, the government submitted more than ample evidence at trial to support either theory of the mail fraud charged in both Counts One and Six.

### 2. The Evidence Supports An Intent to Defraud

Defendants place heavy reliance on the testimony of co-schemer David Radler to argue that the government failed to prove a scheme to defraud International.  They argue that Radler's testimony dooms the conviction on this count.  Specifically, Radler testified that he did not believe that the money for the APC payments came from International, but rather that the Audit Committee had already approved the $5.5 million as management fees for Ravelston.  In other words, Radler's testimony supports Defendants' argument that they did not intend to defraud International of any money or property because the $5.5 million at issue already belonged to Ravelston.

When viewing the other evidence and drawing all inferences in the government's favor, there is sufficient evidence from which the jury could reasonably have concluded that Radler's testimony was simply wrong, and that the $5.5 million not only came from International (not as pre-approved management fees for Ravelston), but that Defendants knew it came from International.  Fred Creasey, the Controller at International, testified that he never understood that the $5.5 million in non-competition payments represented management fees that were owed to Ravelston.  (Tr. at 3604.)  He further testified that the $5.5 million was never charged against management fees. (*Id.* at 3608-09.)  The non-competition agreements – each signed by Defendant Kipnis on behalf of APC and the respective individual officer – stated that they were

11

executed "[i]n consideration of [APC's] concurrent payment to Officer . . ."  (Gov. Exs. APC 8, 11, 13, 15.)  None of these agreements mentions or even suggests that the money was a payment coming from Ravelston's management fees.  Indeed, they represent that APC is paying the individual officers not to compete with APC, International's subsidiary.  In addition, the checks disbursing the $5.5 million are each drawn on APC's account – not a management fee or Ravelston account.  (Gov. Exs. APC 9, 10, 14, 16.)  This evidence is combined with the evidence described above that Defendants intentionally concealed the payments and the true nature of them from the Audit Committee and shareholders.  Based on all of this evidence, the jury's rejection of Radler's testimony that the fees were from approved management fees that belonged to Ravelston was reasonable.  The jury had more than sufficient evidence to conclude beyond a reasonable doubt that Defendants knew the $5.5 million belonged to International and intended to defraud International of it.

### 3.    No Constructive Amendment

Defendant Atkinson argues that "to the extent the government claims that the Counts One and Six convictions were based on the disclosure of the APC payments to shareholders, effectively seeking to transform alleged securities fraud into an honest services conviction, that would constitute an improper constructive amendment of the Information and serve as an independent basis to vacate Mr. Atkinson's convictions."  (R. 916-1 at 6.)  "For a change in the indictment to rise to the level of a constructive amendment, it must establish an offense different from, or in addition to, those originally charged.  As such, we are primarily concerned with changes made to the indictment that affect elements of the crime."  *United States v. Mitov*, 460 F.3d 901, 906 (7th Cir. 2006).  *See also United States v. Jones*, 418 F.3d 726, 729-30 (7th Cir.

2005).  Both Counts One and Six allege violations of 18 U.S.C. § 1346 – the honest services

statute.  The Information specifically alleges that the $5.5 million in payments for the APC

transaction "were fraudulent deprivations of International's right to receive honest services from

its officers, directors and controlling shareholder.  The payments to the individuals at

International's expense also were related party transactions.  BLACK, BOULTBEE,

ATKINSON, Radler and KIPNIS failed to investigate and fully disclose the actual nature of the

related party transactions to Internationals' Audit Committee, thereby breaching their fiduciary

duty, fraudulently depriving International of honest services, and concealing the scheme."  (R.

407, Information ¶ 30.)  The Information further alleges that International had to make regular

filings with the SEC and was "obligated in those filing to disclose all material facts about the

company to investors.  Among other things, International was required to fully and accurately

disclose in its SEC filings related party transactions and compensation paid to its officers and

directors."  (*Id.* ¶1q.)  These allegations are consistent with the honest services charges and

convictions on Counts One and Six.

> **B.      Count Seven**

The jury found each Defendant guilty of Count Seven of the Information.  Count Seven

charges them with mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346.  Count Seven charges

a scheme to defraud involving $600,000 in non-competition payments taken out of the reserves

from the Forum and Paxton transactions, even though no non-competition agreements were

executed in either of these transactions.  It charges that Defendants knowingly caused a mailing

in furtherance of the scheme on or about April 9, 2001 which contained four checks: $285,000

for Conrad Black; $285,000 for F. David Radler; $15,000 for John Boultbee; and $15,000 for

Peter Atkinson.  The $600,000 was referred to at trial as a "supplemental non-competition payment."

Like Counts One and Six, in order to prove a defendant guilty of Count Seven, the government had to prove beyond a reasonable doubt that (1) the defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by means of materially false pretenses, representations, or promises; (2) the defendant did so knowingly and with the intent to defraud; and (3) a mailing in furtherance of the scheme.  As noted above, regarding the scheme involving honest services, the government must prove that defendants misused their positions for private gain.  *See Thompson*, 484 F.3d at 883-84.  *See also United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) ("[a] participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants . . .  In the case of a successful scheme, the public is deprived of its servants' honest services no matter who receives the proceeds").

### 1.    Fraudulent Intent

Defendants each argue that the government failed to prove that they acted with fraudulent intent with regard to the payments in Count Seven.

### a.    Black

Defendant Black argues that the evidence fails to establish his fraudulent intent regarding this count.  Viewing the evidence in the light most favorable to the government, the government proved Black's intent to defraud in connection with these supplemental payments.  The evidence showed that in 2000, International entered into an Asset Purchase Agreement to sell newspaper assets to Forum for $14 million and with Paxton for $59 million.  The evidence also demonstrated that there were not any non-competition agreements with the individual officers in

the Forum and Paxton transactions, and the purchasers from Forum and Paxton never requested any such agreements. (Tr. at 2339, 2435-39.)

Co-schemer David Radler further testified that Black called him in Spring 2001 and asked him if there were non-compete agreements in connection with the Forum and Paxton transactions. (*Id.* at 7834-35.) As of Spring 2001, Radler and Black had executed multiple non-competition agreements on behalf of International, Inc. or themselves in connection with International's sale of its community newspaper assets. Radler told Black during the Spring 2001 call that he would get back to him. At the time, Radler thought that over $2 million had been set aside from the sale of Forum and Paxton for the individual non-competes. (*Id.*) Radler contacted Roland McBride, the Chief Financial Officer of the community newspaper group. (*Id.* at 1642, 2757.) Mr. McBride informed him that no money had been set aside for individual non-competes from these transactions, but that APC had $600,000 in its reserve accounts. (*Id.* at 7835-36, 7930.) According to Radler, the reserve funds represented money that International "held back . . . at the American Publishing level in order to accommodate claims made by the buyers of us, of us the seller for – for things that – things that they – we may have missed and working capital adjustments and things of that sort." (*Id.* at 7836-37.)

After learning about the $600,000, Radler and Black agreed to allocate this in the following amounts: $285,000 to Black; $285,000 to himself; $15,000 to Atkinson; and $15,000 to Boultbee. (*Id.* at 7932-33.) Thereafter, Radler contacted Roland McBride about executing the checks and McBride, in turn, sent a memorandum to Lisa Morse directing the issuance of "supplemental non-competition payments" in these amounts. (Gov. Ex. Supp. Payment 1.) Both David Radler and Mark Kipnis were copied on the memorandum. (*Id.*) The checks were then

issued. (Gov. Exs. Supp. Payment 2, 4, 5 & 6.) Radler further testified that these payments to Black, Atkinson, Boultbee and himself from the $600,000 were made according to the same formula they had used in the past for non-compete payments. (*Id.* at 7837.)

Even though this was a related-party transaction, Black did not seek approval from the Audit Committee or the Board of Directors for these payments. Furthermore, the SEC filings did not disclose these payments until the company issued its 10-K and proxy statement, filed in April 2002. (Gov. Exs. Filing 9F, 9G.) These filings blatantly misrepresented that the $600,000 was paid in connection with the sale of newspapers properties, "to satisfy a closing condition," pursuant to non-competition agreements with the buyers "to which each agreed not to compete directly or indirectly in the United States," and with the approval of the "Company's independent directors." (Gov. Exs. Filing 9F, 9G.) All of these representations were false.

This evidence was more than sufficient for the jury to find fraudulent intent beyond a reasonable as to Defendant Black. As such, his motion for judgment of acquittal on this issue is denied.

### b.    Defendants Boultbee and Atkinson

Both Defendants Boultbee and Atkinson argue that the government failed to prove beyond a reasonable doubt that they each had the requisite intent to defraud in connection with the supplemental payment charged in Count Seven. Drawing all reasonable inferences in the government's favor – as the Court must – acquittal is not appropriate on Count Seven as to Defendant Boultbee or Atkinson.

As noted above, the government introduced evidence that co-schemer Radler directed $600,000 remaining in the reserves from the Forum and Paxton transactions as supplemental

non-compete payments, including $15,000 to Boultbee and $15,000 to Atkinson. (Gov. Ex. Supp. Payment 5, 6). The checks were issued from American Publishing Management Services, a subsidiary of International. Although Defendants maintain that these payments were legitimate bonuses, the evidence showed that Defendants never received any legitimate bonus payments from any subsidiary of International. Furthermore, Defendant Atkinson's check stub described the payment as "non-compete pymt." (Gov. Ex. 6.) Atkinson and Boultbee received these checks even though they never executed a non-competition agreement with Forum or Paxton, and even though the purchasers in the Forum and Paxton transactions never requested any such agreements.

The evidence also showed that both Defendant Boultbee and Atkinson each had received a $450,000 check in November 2000 and a $137,500 check in February 2001 from American Publishing Management Services in connection with the APC non-competition scheme charged in Counts One and Six. (Gov. Exs. APC 12, 14) They received the $15,000 checks at issue in Count Seven roughly two months after the February checks.

Furthermore, although Atkinson and Boultbee both disclosed other non-competition payments that they had received during the 2001 fiscal year in their respective Proxy Questionnaires for fiscal year 2001, they did not disclose the $15,000 payment. (Gov. Exs. Filing 7, 8.) Drawing all inferences in favor of the government, their intentional withholding of this information supports the jury's finding that Boultbee and Atkinson intended to defraud International.

Similarly, the SEC filings did not disclose these payments until the company issued its 10-K and proxy statement, filed in April 2002. (Gov. Exs. Filing 9F, 9G.) These filings

misrepresented that the $600,000 was paid in connection with the sale of newspapers properties, "to satisfy a closing condition," pursuant to non-competition agreements with the buyers "to which each agreed not to compete directly or indirectly in the United States," and with the approval of the "Company's independent directors." (*Id.*) All of these representations were false. Viewing the evidence in the government's favor, the supplemental payments qualified as a related party transaction where both Boultbee and Atkinson profited at the expense of International and its shareholders. As such, they breached their duty of loyalty because their actions conflicted with International's interests – they wrongly siphoned off money belonging to International. They failed to bring the transaction to the attention of International's Audit Committee, which creates the inference that Defendants were trying to conceal improper payments.

Furthermore, in approximately late April 2001 and early to mid-May, 2001, Defendant Atkinson had a conversation with Bud Rogers, a partner at Cravath, Swaine & Moore who advises clients on, among other things, securities law. Mr. Atkinson had a subsequent conversation with Paul Saunders, an attorney from the same firm. (Tr. at 4254.) The focus of the conversation was the need to disclose the non-competition payments from the CanWest transaction that had not been disclosed in the public filings. Mr. Rogers explained to Mr. Atkinson that the non-competition payments needed to be disclosed in the SEC filings, and that failure to do so made the filings – including the proxy disclosure and Form 10K – "defective, false, or you know, containing a potentially material mistake." (*Id.*) Mr. Rogers also discussed some potential consequences of not disclosing the non-competition payments. (*Id.* at 4246-47.) He further informed Mr. Atkinson that the public disclosures had to be complete. (*Id.* at 4254.)

During the same time period, Mr. Rogers also discussed the disclosure issue with Mr. Boultbee and informed him of the need to disclose the non-competition payments in the public SEC filings. (*Id.* at 4254-55.) He conveyed to Mr. Boultbee the same information that he provided to Mr. Atkinson. During the conversations and despite Mr. Rogers' strong warnings, neither Mr. Atkinson nor Mr. Boultbee disclosed the supplemental payments, even though they had received them just months before.[2]

Moreover, in May 2003, after the shareholders had complained about the non-compete payments and after the Special Committee had begun its investigation, Defendants Black and Atkinson discussed adding new members to International's Board of Directors. In a May 8, 2003 e-mail, Atkinson tells Black: "Our ability to control the vote at board meetings is crucial. If we do not, with a majority vote the board can go off on any direction and could, strictly speaking, fire all of us . . . . With the addition of 3 new directors we could be in jeopardy." (Gov. Ex. Shareholder 42.) On May 21, 2003, Atkinson again e-mails Black: "I am concerned with moving from one to three directors. I think they are setting a trap. We should only add three after the non compete review phase is completed by the board." (Gov. Ex. Shareholder 51.) Approximately two weeks later, on June 2, 2003, Atkinson tells Black in an e-mail "Until the special committee completes its review I think we should say little about the non-competes." (Gov. Ex. Shareholder 55.) Further, Atkinson directed that "Our position is that we would not have signed them and given up our ability to compete in Canada unless we were compensated for that loss." (*Id.*). The jury could reasonably construe Atkinson's statements as an attempt to

---

[2] Defendants attempt to place a different spin on the testimony from Mr. Rogers, but the Court must view it in the light most favorable to the government.

protect the scheme from being uncovered, and to maintain a united position with his co-schemer Black.

Defendants' arguments ask the Court to reweigh the evidence presented at trial or to look at it in a light favorable to them, not the government.  In assessing a motion for judgment of acquittal, however, the Court does "not reweigh evidence or reassess the credibility of witnesses; these are jury determinations to which we defer."  *United States v. Griffin*, 194 F.3d 808, 816 (7th Cir. 1999).

Similarly, Defendants' argument that the government did not introduce evidence of any conversations between them and co-schemer Radler is unavailing.  A co-schemer need not have awareness of his co-schemer's acts in furtherance of a scheme to defraud as long as "the evidence adequately establishes [the defendant's] own knowing participation in the same scheme."  *United States v. Adeniji*, 221 F.3d 1020, 1026 (7th Cir. 2000).  The evidence establishes both Defendant Atkinson's and Defendant Boultbee's knowing participation in the scheme charged in Count Seven of the Information beyond a reasonable doubt.

### c. Defendant Kipnis

Defendant Kipnis contends that he is entitled to judgment of acquittal regarding the $600,000 supplemental payments because he neither caused the payments nor had any knowledge of them or their fraudulent nature.  Because no rational jury could have found that Kipnis had the requisite intent to defraud in connection with the supplemental payments, the Court grants a judgment of acquittal as to Defendant Kipnis on Count Seven.

Defendant Kipnis represented International in the Forum and Paxton transactions and drafted the non-competition agreements with **International** and **Inc.** in connection with these

transactions.[3]  But even when viewed in the light most favorable to the government, the evidence does not support the jury's determination that Defendant Kipnis was materially involved in, or intended to defraud International in connection with, the supplemental payments.  Unlike the non-competition payments involved in the underlying Forum and Paxton transactions, the supplemental payments did not issue pursuant to non-competition agreements.  And far from implicating Kipnis, the key testimony on this issue tends to exculpate Kipnis.  In fact, Radler testified that after the Paxton and Forum transactions had closed, he asked Defendant Kipnis about the individual non-competes, and Kipnis "indicated that he had forgotten about the Forum – the Forum – and Paxton non-competes, and, that they – it was a very busy time; he had been busy; and, they had – nothing had been done."  (Tr. at 7931.)  Radler did not tell him that he was going to try to nonetheless obtain the payments.  He also did not ask Kipnis to draft any individual non-competes at that time, even though Kipnis had drafted other non-compete agreements, including the ones with International and Inc. in the Forum and Paxton transactions. Instead, Radler contacted Roland McBride at APC, discovered that $600,000 had been set aside in reserve accounts, and directed that McBride issue checks to Black ($285,000); Black ($285,000), Atkinson ($15,000) and Boultbee ($15,000).  (*Id.* at 7835-37, 7930-33.)  Radler did not convey this information to Kipnis.  Nor did Kipnis receive any money from the $600,000 supplemental payments.  Mr. McBride subsequently sent the April 6, 2001 memorandum to Lisa Morse directing the issuance of "supplemental non-competition payments" in these amounts, and copied both Radler and Kipnis on it.  (Gov. Ex. Supp. Payment 1.)  The memorandum noted that

---

[3]     The jury acquitted him on both counts that charged him with a mailing and wire communication in connection with these agreements.

the payments were "to be charged against the remaining sale reserves for Paxton and Jamestown." (*Id.*) There is no evidence that Mark Kipnis received the memorandum other than the fact that he was copied on the bottom of the memorandum, and David Radler testified that he did not recall receiving the memorandum even though he was copied on it. No one testified that he or she sent the memorandum to either of the individuals copied on it. The government did not introduce any evidence that Kipnis or his office maintained a copy of it.

As discussed below, the government introduced sufficient evidence from which a rational trier of fact could have found that the checks were mailed on April 9, 2001 from APC in Marion, Illinois to Mark Kipnis' office in Chicago. But even drawing all reasonable inferences in favor of the government, the checks and the April 6, 2001 memorandum are not sufficient to establish beyond a reasonable doubt on the distinct issue that Kipnis had knowledge of the fraud. The government did not introduce any direct evidence that Defendant Kipnis knew about these payments or that anyone had any agreement with him about the payments. Thus, to sustain conviction, there must be sufficient circumstantial evidence to infer his knowledge and specific intent to defraud. This inference is based on essentially two pieces of evidence: (1) the April 6, 2001 memorandum and (2) the mailing of the checks to Kipnis' office. To infer that Kipnis knowingly engaged in the scheme charged in Count Seven based on this thin reed of evidence amounts to speculation. *See United States v. Moore*, 115 F.3d 1348, 1364 (7th Cir. 1997) (conviction cannot rest upon speculation or conjecture). Accordingly, the Court grants Kipnis' motion for judgment of acquittal on Count Seven.

## 2. The Government Proved the Mailing in Count Seven Beyond A Reasonable Doubt

Defendants also argue that the government failed to prove the charged mailing beyond a reasonable doubt in connection with Count Seven. A defendant need not personally mail the mailing at issue in the charge. *United States v. Hickok*, 77 F.3d 992, 1004 (7th Cir. 1996) (citations omitted). The government must prove that the defendant knowingly caused the mails to be used in furtherance of a scheme to defraud. *Id.,* (quoting *United States v. Brocksmith,* 991 F.2d 1363, 1367 (7th Cir. 1993)). Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, *even though not actually intended,* then he causes the mails to be used for purposes of the mail fraud statute." *Id.*, quoting *Pereira v. United States,* 347 U.S. 1, 8-9, 74 S. Ct. 358, 362-63, 98 L. Ed. 435 (1954) (emphasis added). *See also United States v. Ratliff-White*, 493 F.3d 812, 818 (7th Cir. 2007).

The government can prove a mailing through direct or circumstantial evidence. *United States v. Szarwark*, 168 F.3d 993, 995-96 (7th Cir. 1999); *United States v. Ledesma,* 632 F.2d 670, 675 (7th Cir. 1980). Contrary to Defendants' suggestion, the government does not have to introduce the envelope used for the mailing. *Ledesma*, 632 F.2d at 675 ("It is of course true that the introduction of the envelope in which the correspondence was mailed would have been strong direct evidence of mailings, but testimony as to office practice is sufficient proof of mailing."). Evidence that mail or wire transmissions occur in the usual course of business is ordinarily sufficient to show that a particular transmission occurred on a given occasion. *See Ratliff-White*, 493 F.3d at 818; *United States v. Swinson*, 993 F.2d 1299, 1301 (7th Cir. 1993); *Szarwark*, 168 F.3d at 996; *United States v. Mankarious*, 151 F.3d 694, 702-3 (7th Cir. 1998).

Here, the government introduced sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that a mailing occurred on April 9, 2001 from Marion, Illinois to Mark Kipnis' office in Chicago, Illinois. In particular, an April 6, 2001 American Publishing Management Services, Inc.'s Inter-Company Memorandum from Roland McBride to Lisa Morse requested the issuance of "supplemental non-competition payments" in specified amounts to Black, Radler, Boultbee and Atkinson. (Gov. Ex. Supplemental Payment 1). The memorandum specifically directed that the "checks should be sent Monday via over night delivery to Mark Kipnis." (*Id.*) April 6, 2001 was a Friday, and April 9, 2001 was a Monday. The checks at issue in the mailing were dated April 9, 2001, as directed in the April 6, 2001 memorandum, and issued to the specified individuals and for the precise amounts identified in that memorandum. (Gov. Exs. Supp. Payment 2, 4, 5, 6.) This circumstantial evidence supports the jury's verdict. *See Mankarious*, 151 F.3d at 702-03; *United States v. Alexander*, 135 F.3d 470, 475 (7th Cir. 1998).

Furthermore, the government introduced course of business evidence through Angela Way, Mr. Kipnis' secretary at the time of the mailing. Ms. Way testified that it was common occurrence as part of her job to receive packages from Mr. McBride in Marion, Illinois for Mr. Kipnis. (Tr. at 2764.) The packages, according to Ms. Way's testimony, generally were sent overnight or occasionally second day delivery via UPS. (*Id.* at 2764-65.) Ms. Way further testified that she never received any materials from Mr. McBride's office in Marion, Illinois via hand delivery. (*Id.* at 2765.) She also provided an example of checks that APC send via overnight delivery from Marion, Illinois to Mr. Kipnis in Chicago, Illinois. (*Id.* at 2765-67.)

Viewing all of this evidence in the light most favorable to the government, the inferences

directly support the inference of the mailing and the government has proven the April 9, 2001 mailing beyond a reasonable doubt. Defendants' cited cases do not provide otherwise. Those cases – in contrast to this case – all involve factual scenarios where the government failed to introduce sufficient evidence to prove that the mailing occurred beyond a reasonable doubt. *See Swinson*, 993 F.2d at 1302-03 (finding that government did not prove mailing beyond a reasonable doubt where little evidence of usual practice and evidence contradicted that defendant followed any usual practice); *United States v. Brooks,* 748 F.2d 1199, 1202-04 (7th Cir. 1984) (conviction reversed where testimony only proved a probability that the mails had been used); *United States v. Joyce*, 499 F.2d 9, 15-19 (7th Cir. 1974) (reversing conviction for mail fraud where only witness testifying as to use of mails raised reasonable doubt as to the use); *United States v. Browne*, 225 F.2d 751, 756-57 (7th Cir. 1955) (reversed conviction where only testimony regarding use of the mails was speculative and the government's own witness testified "against an inference that it was received through the mails"). Here, the government met its burden.

### C.    Count Thirteen

Defendant Black was convicted of concealing documents from an official proceeding, in violation of 18 U.S.C. § 1512(c)(1), as charged in Count Thirteen of the Information. In order to find him guilty, the jury had to find that the government had proven beyond a reasonable doubt that Defendant Black corruptly concealed, or attempted to conceal, records, documents, or other objects, with the intent to impair the availability of the records, documents, or other objects in an official proceeding. 18 U.S.C. § 1512(c)(1). Viewing the evidence in the light most favorable to the government, the government introduced sufficient evidence from which a rational trier of

fact could find Defendant Black guilty of this charge beyond a reasonable doubt.

Both the investigation by the United States Securities and Exchange Commission ("SEC") – a Federal Government agency authorized by law – and the pending federal grand jury investigation in Chicago constitute "official proceedings" for purposes of Section 1512.  The government introduced evidence that Black had knowledge of the SEC investigation as early as November 2003 when his attorney sent him a letter from the SEC that the SEC was conducting an investigation of Hollinger and was seeking documents from Black.  (Gov. Ex. Toronto 1.)  Those documents included some of the non-competition agreements at issue in this case.  The government further introduced evidence from which a reasonable juror could have concluded that Black knew about the federal grand jury investigation given that he had hired attorneys with extensive criminal experience by the time he removed the documents, and the fact of the criminal investigation widely known, including by his loyal personal assistant.

On approximately May 19, 2007, the SEC sought more documents from Black.  (Gov. Ex. Toronto 18).  The next day Black personally – along with his personal assistant Joan Maida and his chauffeur – removed 13 boxes of documents from his office at 10 Toronto Street, including documents pertinent to both the SEC and grand jury investigations.  Prior to Black's arrival at the office, his assistant contacted him to inform him that she could not leave 10 Toronto Street with the boxes.  When Black arrived with his chauffeur at 10 Toronto Street, they parked in a spot near the building where Black typically did not park.  The government introduced a security video which showed Defendant Black personally carrying some of the boxes to his vehicle.  (Gov. Ex. Video 2).  Even his assistant testified that she had never seen Black personally carry any boxes out of the office.  Furthermore, the video captured Black

pointing at the security camera in the building as he carried the boxes out of it. Viewing this in the light most favorable to the government, the evidence more than adequately supports the jury's verdict that Black removed these boxes to conceal or to attempt to conceal them with the intent to impair their availability in the SEC or grand jury proceeding.

## II.     Defendants Are Not Entitled to A New Trial

Defendants also contend that they are entitled to a new trial based on various errors. Federal Rule of Criminal Procedure 33 ("Rule 33") provides for a new trial where, after considering the credibility of the witnesses, the court concludes that the jury's verdict is "so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). A court may also grant a new trial "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Eberhart,* 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds by Eberhart v. United States*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005). A defendant is entitled to a new trial based on an erroneous evidentiary ruling where the error had a "substantial and injurious effect or influence on the jury's verdict." *United States v. Redditt*, 381 F.3d 597, 601 (7th Cir. 2004)(citations omitted).

Defendants raise various arguments in support of their motions for a new trial. Defendant Black argues that (1) the weight of the evidence against him warrants a new trial; (2) the reference to the Canadian court order deprived him of a fair trial; and (3) the Court improperly instructed the jury regarding deliberate indifference. Defendant Boultbee contends that he is entitled to a new trial because: (1) the evidence raises a "strong doubt" as to his guilt

on the counts of conviction; (2) the Court improperly admitted hearsay evidence; and (3) he was entitled to a severance of his trial from his co-defendants. Defendant Atkinson argues that he is entitled to a new trial based on the weight of the evidence. Finally, Defendant Kipnis contends that a new trial is appropriate because (1) the weight of the evidence requires one, including the government's mischaracterization of his state of mind; and (2) the Court erred in denying his motion for severance from his co-defendants.

### A. The Weight of the Evidence Does Not Warrant A New Trial

Defendant Black seeks a new trial, arguing that the weight of the evidence left a strong doubt as to his guilt. As to the obstruction count, he asserts that "the great *weight* of the evidence favors Mr. Black's innocent explanation rather than the government's nefarious one." (R. 872, Mem. In Support of New Trial at 5.) Defendant Black argues that a "manifest injustice" will occur if the guilty verdicts in the case stand. Similarly, the other Defendants attack the weight of the evidence, also arguing that a new trial is mandated in the interest of justice. The Court disagrees.

As discussed in detail above, with the exception of Defendant Kipnis and Count Seven, the government introduced more than sufficient evidence to support each Defendant's conviction on the mail fraud counts and Defendant Black's obstruction of justice conviction. The evidence consisted of substantially more than the testimony of co-schemer Radler whose credibility Defendants venomously attack. The evidence described above reveals that the extensive evidence introduced by the government at trial does not "preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007). Accordingly, a new trial is not warranted.

**B.**     **Defendant Black Was Not Deprived of A Fair Trial by the Reference to the Canadian Court Order**

Defendant Black next argues that the government's references to the Canadian court order unfairly prejudiced him, thus mandating a new trial. He contends that the government invited the jury to improperly convict him for violating the Canadian order, and not the laws of the United States.

The Information references the Canadian court order in the obstruction of justice count. As addressed in the pre-trial motions, the Canadian court entered an order on December 17, 2004 prohibiting removal of the documents from Black's offices at 10 Toronto Street. Specifically, the Canadian court ordered that no documents "currently resident at 10 Toronto Street shall be removed, altered or destroyed without the consent in writing of the Inspector or further Order of this Court." The Canadian order was legally relevant to the obstruction of the official proceedings in that it explained the circumstances surrounding the charged May 20, 2005 conduct. *See United States v. Black*, 469 F. Supp. 2d 513, 541-42 (N.D. Ill. 2006).

The obstruction of justice count charged Defendant Black with concealing and attempting to conceal the content of 13 boxes from inside offices at 10 Toronto Street "with the intent to impair their availability for use in official proceedings, namely the SEC proceeding against BLACK, the criminal investigation of BLACK by a Federal grand jury and the pending criminal proceeding against BLACK before a judge and court of the United States." Although legally relevant, Defendant correctly noted – and the Court so held – that the Canadian court order could not serve as an "official proceeding" under Section 1512. Contrary to Defendant's assertion, the government did not argue otherwise. The government even specifically informed the jury in its closing argument that Black was not charged with obstruction of justice for

violating the Canadian court order. (Tr. at 13871.) Furthermore, the Court instructed the jury

during the presentation of evidence that violation of the Canadian order was not the crime

charged in the Indictment. (*Id.* at 10656, 10800). The Court repeated this instruction during the

government's closing arguments. (*Id.* 13871, 14998-99.) Finally, at the close of the case, the

Court specifically instructed the jury as follows:

> The term "official proceeding" includes a proceeding before a judge or court of the
> United States, a proceeding before a Federal grand jury, and a proceeding before a
> Federal Government agency which is authorized by law. The United States Securities
> and Exchange Commission (the "SEC") is a Federal Government agency which is
> authorized by law.

> Neither an investigation by the United States Attorneys Office, nor any Canadian court
> proceeding, nor any internal corporate document retention policy constitutes an "official
> proceeding."

(R. 771 at 44.) This instruction squarely addresses Defendant's objection, and the Court

presumes the jury followed its instructions. *See United States v. Emerson*, --- F.3d ----, 2007

WL 2566005, at *5 (7th Cir. 2007); *Smith*, 415 F.3d 682, 688-89 (7th Cir. 2005) (courts

"presume that juries follow their instructions"). Accordingly, the references to the Canadian

court order do not form the basis for a new trial.

### C.    The Ostrich Instruction Was Proper

After closing arguments, the Court gave the following instruction regarding knowledge:

> When the word "knowingly" or the phrase "the Defendant knew" is used in these
> instructions, it means that the Defendant realized what he was doing and was aware of
> the nature of his conduct, and did not act through ignorance, mistake or accident.
> Knowledge may be proved by the Defendant's conduct, and by all the facts and
> circumstances surrounding the case.

> You may infer knowledge from a combination of suspicion and deliberate indifference to
> the truth. If you find that a Defendant had a strong suspicion that criminal conduct was
> occurring, yet intentionally shut his eyes for fear of what he would learn, you may
> conclude that he acted knowingly, as I have used that word. You may not conclude that a

defendant had knowledge if he was merely negligent in not discovering the truth.

(R. 771, Jury Instructions at 65.)  Defendant Black now argues that the Court erred in giving the second paragraph of this instruction, commonly known as the "ostrich instruction."  He contends that the government failed to adduce evidence from which a jury could conclude that he was deliberately ignorant.  Defendant's argument fails.

      **1.**      **The Instruction**

In essence, the ostrich instruction informs the jury that the legal definition of "knowledge" includes deliberate avoidance of knowledge.  The Seventh Circuit teaches that the "ostrich instruction is appropriate where (1) the defendant claims a lack of guilty knowledge, and (2) the government has presented evidence sufficient for a jury to conclude that the defendant deliberately avoided learning the truth." *United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007) (citing *United States v. Carrillo*, 435 F.3d 767, 780 (7th Cir. 2006)).  "Deliberate avoidance is not a standard less than knowledge; it is simply another way that knowledge may be proven." *Id.* (citing *Carrillo,* 435 F.3d at 780).  The ostrich instruction rests on the premise that "[f]or purposes of criminal liability, deliberately avoiding knowledge of a criminal activity is the same thing as having actual knowledge of that activity." *Carrillo,* 435 F.3d at 780-81.  "The purpose of the ostrich instruction 'is to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings.'" *Id.* (quoting *United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999)).  "The logic . . . is that given what the defendant knew, it would be permissible for a jury to conclude that the defendant strongly suspected involvement in illegal activity, but purposely avoided

finding out for sure." *Id.*

As Judge Posner describes it:

[Ostriches] do not just fail to follow through on their suspicion of bad things. They are not merely *careless* birds. The bury their heads in the sand so that they will not see or hear bad things. They *deliberately* avoid acquiring unpleasant knowledge. The ostrich instruction is designed for cases in which there is evidence that the defendant, knowingly or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings. A deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires.

*United States v. Giovannetti,* 919 F.2d 1223, 1228 (7th Cir. 1990) (emphasis original).

The instruction requires more than simply negligence. Moreover, "[i]nherent in this instruction is the difficulty in distinguishing between the cutting off of one's curiosity and a simple lack of effort. The latter cannot be punished." *United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006).

### 2.      **Evidence of Deliberate Ignorance**

"Evidence of deliberate ignorance can be placed into two general categories: evidence of 'overt physical acts,' and evidence of 'purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will.'" *Carrillo*, 435 F.3d at 781. "The first category, as [the Seventh Circuit] explained, is generally the easy case, because there is evidence the defendant physically acted to avoid knowledge." *Id.* (citing *Giovannetti*, 919 F.2d at 1228). "As an example of such a case [the Seventh Circuit] gave *United States v. Diaz*, 864 F.2d 544, 550 (7th Cir. 1988), where the defendant attempted to distance himself from a drug transaction by 'absenting himself from the scene of the actual delivery and sometimes by pretending to be fussing under the hood of his car.'" *Giovannetti*, 919 F.2d at 1228. "The second category, psychological avoidance, is more troublesome. The act in this category is a mental act – a

cutting off of one's normal curiosity by an effort of will." *Carrillo*, 435 F.3d at 781 (citing *Giovannetti*, 919 F.2d at 1229). "The difficulty in a psychological avoidance case – one without any outward physical manifestation of an attempt to avoid facts – lies in distinguishing between a defendant's mental effort of cutting off curiosity, which would support an ostrich instruction, and a defendant's simple lack of mental effort, or lack of curiosity, which would not support an ostrich instruction. *Id.* (citing *Giovannetti*, 919 at 1228-29). "There is generally no way to peer directly into the defendant's thought process to determine whether he or she has become suspicious and then dismissed the uncomfortable thought for fear of its consequences." In all events, "[t]he focus is on what the defendant knew and whether the defendant knew enough to support an inference that he or she remained deliberately ignorant of facts constituting criminal knowledge." *Id.*

In addition, "[g]reat caution must be exercised, however, in determining which circumstances support the inference of deliberate ignorance." *Id.* "The most important principle for the district court to keep in mind is that the ostrich instruction is not meant to allow a jury to convict a person for negligence." *Id.* (internal citation omitted).

### 3. There Was Sufficient Evidence of Deliberate Ignorance in This Case

Defendant Black argues that he does not have guilty knowledge. As held by the Court during the trial, there was more than sufficient evidence of deliberate ignorance – and actual knowledge – to warrant the Ostrich instruction regarding Mr. Black. The Court previously addressed this issue in detail during the trial, and incorporates its prior ruling here.

Regarding Counts One and Six, Defendant Black signed a non-competition agreement with APC, a subsidiary of International that only had one small community newspaper. He

received $2,612,500 essentially not to compete with himself. Even though APC had only one small paper that it intended to sell and Defendant knew he was not a threat of competing with APC, he nonetheless signed the non-competition agreement, took the money, and did not ask any additional questions. Defendant Black further failed to seek approval of this related-party transaction from the independent Audit Committee or to disclose it to the shareholders.

Looking at Count Seven, Defendant Black had a conversation with co-schemer Radler in the Spring of 2001 – months after the closing of the Forum and Paxton transactions – asking him if there were non-compete agreements in connection with these transactions. In response, Radler said he would get back to him. Even though no non-competition agreements had been executed with Black or the other individual officers in the Forum and Paxton transactions, Radler subsequently called Black back and informed him that no money had been set aside for individual non-competes from these transactions, but APC had $600,000 in its reserve accounts. They discussed the allocation, and Defendant Black received $285,000 from the reserves. Black never disclosed the payment to the independent Audit Committee or sought their prior approval of it. Furthermore, the public SEC filings misrepresented the $600,000 as being paid in connection with the sale of newspapers properties, "to satisfy a closing condition," pursuant to non-competition agreements with the buyers "to which each agreed not to compete directly or indirectly in the United States," and with the approval of the "Company's independent directors." Defendant Black did not correct these false representations or ask any questions about why he was receiving the money, even though he knew he never signed a non-competition agreement.

Given this evidence, the jury could have inferred knowledge on the basis that Defendant

Black deliberately avoided learning the truth. The evidence supports a finding that "given what [each] defendant knew, he must have forced his suspicions aside and deliberately avoided confirming for himself that he was engaged in criminal activity." *Carani*, 492 F.3d at 873 (citations omitted).

Finally, the Court addressed Defendant's concerns that the jury might convict based on negligence by instructing the jury that they could not convict any Defendant based on mere negligence. Specifically, the Court instructed: "You may not conclude that a defendant had knowledge if he was merely negligent in not discovering the truth." (Tr. at 15188.) Defendant Black is not entitled to a new trial based on the Ostrich instruction.

### D.    Hearsay Rulings

Defendant Boultbee argues that a new trial is warranted because the government did not prove a conspiracy as it had represented in its *Santiago* proffer, and thus the Court admitted an "enormous amount of otherwise inadmissible and highly prejudicial hearsay evidence against Boultbee." (R. 877, Mem. In Support of New Trial at 2.)

Statements of co-conspirators are not hearsay. Specifically, Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it is "offered against a party" and is a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). In *Untied States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), overruled on other grounds by *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987), the Seventh Circuit held that "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the [statement] is admissible." *Id.* at 1134.

*See also United States v. Ladd*, 218 F.3d 701, 704 (7th Cir. 2000) ("For coconspirator statements to be admitted pursuant to Rule 801(d)(2)(E), the Government must prove by a preponderance of the evidence that a conspiracy existed, that both the declarant and the defendant were members of the conspiracy, and that the statements were made in the course and in furtherance of the conspiracy.").

Prior to trial, the Court held that the government had met its burden of proof under *Santiago* and conditionally admitted certain statements. (R. 500-1). The Court reviewed the particular categories of statements challenged by Defendants and granted Defendants' motion in part to preclude the admissibility of certain statements under *Santiago*. (*Id.*) During the trial, the Court also addressed the admissibility of particular statements that the government sought to introduce pursuant to Rule 801(d)(2)(E). During trial, the Court held that the government's proof at trial met its burden under *Santiago*. Defendant Boultbee offers no basis for the Court to revisit these prior rulings.

### E. Defendant Kipnis' Additional Arguments Fail

Defendant Kipnis claims that the government mischaracterized evidence regarding his motive to commit the crimes. The Court addressed this issue during the trial, including during a lengthy hearing on Defendant Kipnis' motion. (Tr. at 13554-601.) Defendant does not present any basis for the Court to revisit its prior ruling. Furthermore, the Court repeatedly instructed the jury that the attorneys' arguments were not evidence and should not be considered by them as evidence. This challenge fails.

Defendant Kipnis' argument that the case was too complicated for the jury to differentiate and separate the Defendants also fails. The jury was extremely attentive and

deliberative throughout the trial.  There is no basis to assert that they could not and did not

differentiate among Defendants.  As the Seventh Circuit has recognized:

> [Juries] . . . are presumed capable of sorting through the evidence and considering the
> cause of each defendant separately.  In this regard, the Supreme Court has observed:  "To
> say that the jury might have been confused amounts to nothing more than an unfounded
> speculation that the jurors disregarded clear instructions of the court in arriving at their
> verdict."

*United States v. Briscoe*, 896 F.2d 1476, 1517 (7th Cir. 1990), quoting *Opper v. United States*,

348 U.S. 84, 95, 99 L. Ed. 101, 75 S. Ct. 158 (1954).  *See also United States v. Schweihs*, 971

F.2d 1302, 1321 (7th Cir. 1992) ("Juries are normally presumed to be capable of sorting through

evidence and considering separately the charges against codefendants").

### F.    The Court's Severance Decision Does Not Warrant A New Trial

Defendants Boultbee and Kipnis contend that they are entitled to a new trial because the

Court erred in denying their motions for severance.  Defendant Boultbee argues in a footnote that

because the government did not prove a conspiracy, the Court should have granted the motion to

sever.

The Seventh Circuit recently reiterated the standard for severance pursuant to Rule 14 of

the Federal Rules of Criminal Procedure:

> In order to prevail on his argument that the district court erred in denying his motion for
> severance under Fed. R. Crim. P. 14(a), it is necessary (though not sufficient) for Warner
> to show prejudice.  *Zafiro v. United States,* 506 U.S. 534, 538-39, 113 S. Ct. 933, 122
> L.Ed.2d 317 (1993).  *See also United States v. Souffront,* 338 F.3d 809, 831 (7th Cir.
> 2003) (citing *United States v. Lane,* 474 U.S. 438, 449, 106 S. Ct. 725, 88 L. Ed. 2d 814
> (1986)).  "Limiting instructions . . . often will suffice to cure any risk of prejudice, and
> tailoring relief from prejudice is left to the district court's discretion. *Zafiro,* 506 U.S. at
> 539-541, 113 S. Ct. 933.  Where joinder of defendants was proper, a district court should
> grant a severance under Rule 14 only if there is a serious risk that a joint trial would
> compromise a specific trial right of one of the defendants, or prevent the jury from
> making a reliable judgment about guilt or innocence. *Zafiro,* 506 U.S. at 539, 113 S. Ct.
> 933. "Actual prejudice does not exist just because "separate trials would have given a

defendant a better opportunity for an acquittal." Rather, the defendant must have been "deprived of his right to a fair trial." *United States v. Rollins,* 301 F.3d 511, 518 (7th Cir. 2002).

*United States v. Warner*, 498 F.3d 666, 700 (7th Cir. 2007). Furthermore, "[t]he preference is for a joint trial of defendants who, were indicted together." *Carrillo*, 435 F.3d at 778 (citing *Zafiro,* 506 U.S. at 537). "In all but the 'most unusual circumstances,' the risk of prejudice arising from a joint trial is 'outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.'" *United States v. McClurge,* 311 F.3d 866, 871 (7th Cir. 2002), quoting *United States v. Blassingame,* 197 F.3d 271, 286 (7th Cir. 1999).

At the end of the trial, the Court instructed the jury to give separate consideration to each charge and to each Defendant. Such instructions are "an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence." *United States v. Pulido*, 69 F.3d 192, 208 (7th Cir. 1995) (quoting *United States v. Berardi*, 675 F.2d 894, 901 (7th Cir. 1982).). The Seventh Circuit has repeatedly held that courts "presume that juries follow their instructions." *United States v. Smith*, 415 F.3d at 688-698.

As discussed in detail in the Court's pretrial ruling, Defendants failed to establish that they were entitled to a severance. (R. 435-1). Neither Defendant Boultbee nor Kipnis has demonstrated the infringement of any trial right or actual prejudice from being tried with their co-defendants. Accordingly, their motion is denied.

## CONCLUSION

For the reasons discussed above, the Court denies Defendants Black's, Boultbee's, and Atkinson's  motions for judgment of acquittal and for a new trial.  Defendant Kipnis' motion for judgment of acquittal is denied as to his convictions on Counts One and Six, and granted as to his conviction on Count Seven.  Defendant Kipnis' motion for a new trial is denied.

Dated:  November 5, 2007                              ENTERED:


                                                                                          _____
                                                                                          AMY J. ST. EVE
                                                                                          United States District Court Judge